## THE SHADWAN.

### DONKIN et al. v. HERBST et al.

### HERBST et al. v. DONKIN et al.

(*District Court, S. D. New York.* February 9, 1892.)

**CHARTER-PARTY—VESSEL OUTSIDE CHARTER LIMITS—MASTER, CHARTERER'S AGENT— HEALTH LAWS—CHARTERER'S DUTY TO PROCURE CLEAN BILL OF HEALTH.**

The charterer of a vessel, running under a time charter from the river Platte to the United States or the United Kingdom or Europe, made a subcharter, which provided that the ship should go outside her charter limits, and take a cargo from Progresso, Mexico. The charter provided that the master, though appointed by the owner, should be under the orders of the charterer. The ship went from Buenos Ayres, an infected port, to Progresso, where the health officer refused her admittance. The ship then went to Key West, where the master telegraphed the charterer that he could not return to Progresso without a clean bill of health from some other place. The vessel on same day was put in quarantine at Key West for 30 days. After some further telegrams, the charterer ordered the ship to return to Progresso immediately. After the vessel was ready for sea, with steam up and anchor chain short, the charterer telegraphed to have the papers *viséed* by the Spanish consul, to which the master replied, "Too late" and went to Progresso, where he was again refused admittance, and, after much consequent delay, the charter was terminated. The charterers declined to pay the charter hire, averring that they had suffered damage by reason of the master's failure to obtain the *visé*, and, on being sued for the charter money, brought a cross-suit to recover such damages. *Held*, that the owners were under no obligation to obtain clean health papers for Progresso, since they never authorized the ship to go there; that the master was the charterer's agent in respect thereto; and that the master's defaults, if any, did not become the faults of the owners. And, it appearing also that the final refusal to permit the ship to enter at Progresso was not due to the lack of the *visé*, but because she came from an infected port, and without a clean bill of health, for which the owners were not responsible, *held*, that the charterer's claim of damages should be dismissed, and the ship recover her charter money.

In Admiralty. Libel by Richard S. Donkin *et al.* against Robert Herbst and others to recover charter hire of the steamer Shadwan, and cross-libel by respondents against libelants for damages in failing to obey charterer's orders. Decree for libelants.

*Butler, Stillman & Hubbard* and *Mr. Mynderse*, for R. S. Donkin.
*Owen, Gray & Sturges*, for Robert Herbst.

BROWN, District Judge. The original libel was filed to recover the charter hire of the British steamer Shadwan, which was chartered to the defendant Robert Herbst, under a time charter from December 8, 1886, to run within specified limits, from "New York to port or ports in the river Platte and back to port or ports in the United States, or in the United Kingdom, and in the continent of Europe between Bordeaux and Hamburg."

As a counter-claim the answer and cross-libel set up a small item of damage through the misdelivery of a part of the cargo at Buenos Ayres and Montevideo, and a much larger claim for damages from alleged disobedience by the master of the charterer's orders in leaving Key West for Progresso without proper papers to entitle the vessel to enter the latter port, in consequence of which a great deal of time was lost, and the

loading of cargo at Progresso under a subcharter prevented, to the further great damage of the charterer. The facts bearing upon the counterclaim, and the defense to it, run into much complication of detail; but after a careful examination the view that I take of the case does not require any extended mention of the particulars to make intelligible the grounds of my decision.

The whole trouble grew primarily out of the charterer's diversion of the ship from the charter limits by a subcharter executed by him to Thebaud Bros., which provided that the steamer should go to Progresso, Mexico, for a cargo. Progresso was outside of the charter limits. The vessel went thither from Buenos Ayres, an infected port, and was refused admittance by the board of health. She then went to Key West, whence after much correspondence with the charterer in New York by telegram and by letters, and after coaling, she went again to Progresso, and was again positively refused admittance. Thereupon the charter was terminated, and these suits instituted between the parties.

The particular order which the master is charged with disobeying was contained in a telegram from the charterer to the master at Key West on the 28th of March, 1887, which directed the master, in the absence of any Mexican consul at Key West, to get the ship's papers *viséed* by the Spanish consul there. At that time the ship had already cleared for Progresso and was getting under way; and the master telegraphed in reply: "Shadwan sailed. Last dispatch too late. Papers right."

Under all the circumstances of the case as disclosed in the correspondence, I am of the opinion that the master's failure to try to get his papers *viséed* by the Spanish consul does not make the owners answerable for the subsequent refusal of an entrance permit at Progresso, nor for loss of freight under the subcharter. The circumstances show that the master was but little, if at all, to blame for not seeking to get the *visé* of the Spanish consul at Key West; that there is little, if any, possibility that such a *visé* would have made any difference in the result; and that the master, as regards what he did or omitted to do in reference to getting clean papers for Progresso, was the agent of the charterers only, and not the agent of the owners of the ship, who had never authorized him to go to Progresso, and took none of the risks of the ship's having proper papers for entrance there.

The master had arrived at Key West from Progresso on the 12th of March, 1887. On the 13th he telegraphed to Mr. Herbst, the charterer, that he could not return to Progresso for 13 days; and in a letter of the 14th he wrote that he had omitted to say that the officers said he might "*return in 13 days, if we get clean bill of health from some other place in the mean time.*" The vessel on the same day was put in quarantine at Key West for 30 days; and on the same day Herbst replied—"Obtain clean papers for Progresso quick as possible. Report there again, and persevere." On the 16th the master telegraphed that he could not get clean bill of health at Key West, but would try a substitute; and on the same day wrote that it was impossible to obtain a clean bill of health,

because the health-officer refused to give it; but that they would fumigate and give a strong certificate as a substitute, which, it was hoped, would prove sufficient as a *constructive pratique*. The charterer on the same day telegraphed the master: "Hold you responsible under all circumstances. Advise putting yourself as quick as possible in same possition as when arrived there." On the 18th the master telegraphed: "When coaled will proceed according your instruction, but *fear more detention there unless clean papers from here*." On the next day, the 19th, Mr. Herbst telegraphed the master: "Coal and proceed *immediately* Progresso. Persist in reporting there." Mr. Philbrick on the same day wrote to Mr. Herbst in full to the same effect as the master's letter of the 18th; and Mr. Philbrick's letter was received by the charterer on March 23d. On the 25th of March the charterer urged immediate sailing, and apparently complained to Mr. Barber here, that he "had not authorized the ship to wait for clean papers."

The ship having obtained coals in quarantine from Mr. Philbrick after considerable delay, caused by the charterer's interference with the master's first efforts to coal speedily, it was arranged that the Shadwan should sail on the 29th, after receiving the custom-house documents and bill of health. The vessel was then in the roads with steam up, anchor chain shortened, and ready to get under way. Mr. Philbrick's clerk had brought the clearance papers on board; and with them a telegram from Mr. Herbst directing the master to have the papers *viséed* by the Spanish consul; to which the master replied, as above stated, "Too late, ship sailed." The master had been at no time able to communicate directly with persons on shore; he could only do so through others. The charterer had not expressly appointed any agents for the ship there, but he had been corresponding with Mr. Philbrick in reference to coals, and knew of his efforts in behalf of the ship and of the master; and the charterer suggested no other way to transact shore business than through Mr. Philbrick. The clerk of Philbrick assured the master that the certificate in regard to the vessel's bill of health in its existing form, was such as they used with their own ships and in the usual form, and was sufficient, there being no Mexican consul at Key West. The master relied on this assurance, and answered, "Papers right."

If under the circumstances Mr. Philbrick was not by recognition and adoption the charterer's agent and representative for expediting the ship's departure and getting proper papers for admission to Progresso, then the charterer had no agent for that purpose at all, except the master, who thus became himself the charterer's agent for that purpose. The charterer had been repeatedly informed that the vessel was in quarantine, at a distance from shore, and that the captain was not allowed to go ashore in person. He could do nothing. The charter, moreover, provided expressly "that the captain, although appointed by the owners, shall be under the orders and directions of the charterer, as regards employment, *agency*, or other arrangements." This stipulation bound the master to observe any such arrangement as might be made by the charterer's agents or representatives; and by necessary implication it also

bound the charterer to provide all such agencies as were necessary for the captain's guidance and aid where he could not act personally. In undertaking to send the ship to ports outside of the' charter limits, it was the charterer's business, not the owners' business, to get suitable papers, and the persons employed in doing that business were the charterer's agents, whether the master or other persons. And considering that the ship's inshore business had been conducted by Mr. Philbrick for more than two weeks before the ship sailed, and that the charterer knew of this fact by the various telegrams and letters, I think the captain was fully justified in regarding Mr. Philbrick as the representative of the charterer there, and justified under the circumstances in acting upon Mr. Philbrick's advice, rather than to delay sailing and to incur new complications which would have been likely to arise, by remaining longer at Key West after having cleared and received her clearance papers. In diverting the ship to ports not allowed by the charter, the charterer took all risks of securing to the ship the proper entrance permits, and is not entitled to charge any error of the master in that respect, if there was any, upon the owners, or against the stipulated charter hire. The owners were under no duty to obtain papers for Progresso, since they never authorized the ship to go there; and the master's defaults if any in dealing with the charterer in that regard, did not become the defaults of the owners.

Aside from the above considerations, I am by no means satisfied that the subsequent refusal of entry of the Shadwan at Progresso is attributable to the failure to obtain the *visé* of the Spanish consul at Key West. It is possible that if the matter had remained subject to the action of the local health board at Progresso alone, the substitute for a clean bill of health might have been accepted by the local authorities. The evidence of Aguirre upon the trial gives this some support; but the different statements of this witness at different times on this subject, and his frequent statement on the hearing that the ship must have proper papers to get a "free *pratique*," satisfy me that the ship would not have been legally entitled to entry, whether the doctor might °or might not have overlooked the radical defects in her papers. But in truth the matter was taken wholly out of the authority of the local health board at Progresso by the action of the National Marine Board, whose order was positive that the vessel should not be admitted. The evident intention of this was not that the vessel should be forever excluded, but that entry should not be permitted from Buenos Ayres, an infected port; nor until the ship obtained a clean bill of health from some other port. This is precisely what the master wrote the charterer on March 14th that he had been told by the officers on her first exclusion from Progresso.

There is nothing in the testimony that satisfies me that there was any hope that the order of the National Marine Board would be rescinded, except upon the procurement of thoroughly clean papers. The papers which the Shadwan took to Progresso the second time, even had they been *viseéd* by the Spanish consul at Key West, were not clean papers. On the contrary they expressly stated that the ship had come from Buenos

Ayres, an infected port, and it was not stated that she had passed quarantine. Here was express written notice of her still continuing liability to spread contagious disease. The *visé* of the Spanish consul could not in the slightest degree have changed the essential character of this certificate, or given it the effect of a clean bill of health. Key West, moreover, was but 36 hours distant by steamer from Progresso. Three or four days, therefore, would have been sufficient to obtain the *visé*, had that been all that was necessary to enable the ship to enter at Progresso. She remained at Progresso for 26 days, and during this time the charterer's agents there were in correspondence with the master and the local and national board of health. No suggestion was made by any of them that the *visé* by the Spanish consul at Key West would remove the objection to her entry, or be of any use. The master testifies that no objection to the lack of a consular *visé* was ever made; but that the objection was that she had come from Buenos Ayres, an infected port, as her Key West papers stated. I am satisfied this is the truth, and that the absence of the *visé* was not the real objection to her entry, but the fact of her infectious character, and because she had not obtained, and had not been willing to wait in quarantine at Key West long enough to obtain, a clean bill of health. For this the charterer was directly responsible.

For the small item of damage through the misdelivery or miscarriage of goods, the vessel is liable, no sufficient ground being shown to absolve her from that risk. If the amount of that item is not agreed on, a reference may be taken to ascertain it. The other claims are dismissed. Decrees may be drawn accordingly.