## THE QUEEN OLGA.

(District Court, S. D. New York.  June 12, 1908.)

1. SHIPPING — CHARTER — LIABILITY FOR EXPENSE OF LEGAL PROCEEDINGS AGAINST VESSEL.

In view of the Cuban law, which requires all vessels entering a Cuban port from a foreign port to be provided with a bill of health issued in accordance therewith and granted by the Cuban consul or consular representative at the port of departure, the failure of a vessel to procure such bill of health was the proximate cause of loss and damage incurred by the vessel because of legal proceedings against her in Cuba for entering without such bill of health, and as between owner and charterer such loss must be borne by the one upon whom the duty rested to procure such bill under the terms of the charter.

2. SAME—CONSTRUCTION OF CHARTER PARTY—DUTY TO PROCURE BILL OF HEALTH.

The cost of a bill of health, required by the laws of Cuba to be procured by a vessel entering that country from a foreign port from the consular representative of Cuba at the port of departure, is a consular charge; and under a charter which required the owner to keep the ship, at his own charges, manned, equipped, and fitted to perform the service for which she was hired, and provided that the charterer "shall provide and pay for all  *  *  *  consular charges, except those pertaining to the captain, officers, or crew," it was the duty of the owner, and not of the charterer, not only to pay for, but also to procure, such bill of health, which pertained to the officers and crew.

3. SAME—BREAKDOWN CLAUSE—TIME LOST BY STRANDING.

The breakdown clause of a charter party, providing, inter alia, that in the event of stranding, preventing the working of the vessel for more than 24 hours, "payment of hire shall cease until she be again in an efficient state to resume her service," relates only to physical efficiency; and where the vessel, when again tendered to the charterer for service after a stranding, was in fact in an efficient state and seaworthy, she cannot be continued off hire until her master shall procure a survey and a Lloyd's certificate of seaworthiness.

In Admiralty.  Action for breach of charter party.

In January, 1907, the Queen Olga, belonging to the libelants, was in respondent's employment under a time charter substantially identical with that set forth in Golcar S. S. Co. v. Tweedie Trading Co. (D. C.) 146 Fed. 563. The sections of the charter material to this case are the first, second, ninth, and sixteenth as printed in the case referred to.  In the month mentioned the Olga was at Tampico, and there received directions from the charterer to proceed to Key West for orders.  Before this direction was given there had been some letters sent by the charterer to the steamship's master indicating the probability of his ultimately going to Cuba for sugar, but the orders actually given were definitely as stated.  The Olga then cleared for Key West, having a bill of health such as required for an American port.  She reached, entered, and anchored in the harbor of Key West, and her master went ashore to receive his orders.  They were furnished him by Taylor & Co., merchants at that port, who had no other relation with the charterer than to receive and deliver to the Olga's master a telegram signed by the charterer and reading as follows: "Steamer Queen Olga due Key West fourth order her proceed Sagua la Grande Cuba tender to Amezaga & Company." This telegram was physically delivered to the master, with a letter from Taylor in the following words: "I inclose you cable from Tweedie Trading Co. for you to proceed to Sagua.  Please give pilot order for your pilotage and draught of vessel." The testimony establishes that Taylor & Co. had no other authority from the charterer than is evidenced by the above document, and that they acted merely as messengers or carriers, and received for their service the sum of $10.

The Olga's master correctly believed that it would be unlawful to enter a Cuban port without a bill of health issued in accordance with Cuban law and granted by the Cuban consul or consular representative at the port of departure. He testifies that Taylor directed him to proceed without such bill of health, and assured him that it would not be necessary, suggesting that he tell the Cuban authorities, as an excuse for not producing a proper health bill, that he had not been to Key West, but had received his orders off Sand Key (an island some eight miles from Key West proper). This statement is denied by Taylor. The Olga did proceed to Sagua without entering or clearing at the Key West custom house, and without any other bill of health than that properly procured in Tampico for an American port; and her master did afterwards falsely inform the Cuban authorities that he had received his orders at Sand Key. On arrival in Cuba the captain's fears proved well grounded, and the Cuban authorities began an action against him and his vessel for not having a Cuban bill of health. These proceedings entailed considerable expense for legal services, etc., and resulted in the infliction and payment of a moderate fine upon the master. The master testified under objection that health bills under the charter party in question had previously been furnished him by the charterer's agents, and under like objection a shipping merchant of experience has testified for the respondent that it is the duty of the shipmaster to obtain bills of health when his vessel is under a time charter in the form shown in this case.

While the Olga was entering the port of Sagua she took the ground, remained on the bottom for some time, and finally succeeded in getting off under her own steam. She then made tender to the persons named in the telegraphic orders received at Key West, such persons being the subcharterers. These subcharterers (or their shippers) refused for some time to load the steamer, insisting as a prerequisite for loading that she should be surveyed by steamship captains and a certificate of seaworthiness procured indorsed by a Lloyd's agent. A survey had been held on the Olga, but not by the persons or in the manner thus demanded by the subcharterers. When the Olga tendered for cargo, however, she was as matter of fact "in an efficient state to resume her service" under the charter party, and was also as a matter of fact seaworthy.

The questions raised by this litigation are: First, were the losses and damage (or any portion thereof) incurred by the legal proceedings in Cuba the proximate result of failure to procure a Cuban bill of health at Key West; and if such losses and damage were so proximately caused, are the same chargeable to the charterer or the owner? and, second, was the Olga off hire at the option of the charterers until she had been surveyed and a certificate procured in the manner demanded by the subcharterers or shippers; and, if the vessel was so off hire, were the subcharterers or shippers justified in their refusal to load?

Convers & Kirlin and Mr. Woolsey, for libelant.
R. J. M. Bullowa, for respondent.

HOUGH, District Judge (after stating the facts as above). Considering the strictness of Cuban law as shown by the evidence, there can be no doubt that all the expense and loss visited upon the ship for her failure to obtain a bill of health proper for Sagua was reasonably to be expected and proximately caused by such failure. Responsibility for such omission must depend upon the terms of the contract made by the parties. To be sure, a charter party is a commercial instrument, and to be liberally interpreted, while evidence of custom, if general, reasonable, and lawful, will often control the construction of doubtful clauses. There is no such evidence here. Such testimony as is offered is conflicting and tends to support no general custom, while in my

opinion the wording of the charter itself is too plain to require such assistance.

The price of a bill of health is a consular charge; and all consular charges, "except those pertaining to the captain, officers, and crew," the charterers "shall provide and pay for." Charter, § 2. This by inference is a clear statement that the owners shall "provide and pay for" consular charges, which do pertain to "the captain, officers, and crew." The expression "providing for" a charge is not a happy one; but it is surely the simplest interpretation thereof to hold that what one must provide for he must procure.

Further, a consideration of the first and second sections of the charter clearly shows the reason for the line of demarkation between owners' and charterers' payments and duties. The owner is to keep his ship at his own charges manned, equipped, and fitted to perform the service for which she is hired. The charterer is to pay for every expense incident to his own business. A bill of health primarily relates and pertains to the officers and crew. It is their passport to enter their harbors of destination and there to work their vessel. Only by figure of speech is the instrument called the "ship's" bill; for, if a ship without a crew can be imagined, the reason for a health bill is gone. All this is exactly true of the omitted Cuban bill, an instrument which could not be filled out without information only to be had from the master regarding himself and his men and their sanitary history.

To have the condition of his crew duly certificated by a bill of health was therefore a duty as much owing by the Olga's master to his owners as it was to have enough men on board to work ship: and the charterers in turn had the same right to expect and presume a proper certificate of health as they had to expect and presume a healthy crew. It follows that, as between owner and charterer, it was the former's duty to provide and pay for a bill of health at Key West. That the omission was due to insistence or suggestion by charterer's agent is (1) not established by a fair preponderance of evidence; (2) if Taylor did give the order sworn to by the master, he had no authority, either real or apparent, to do so; and (3) the master had no more excuse for obeying than for following an unlawful suggestion from the same source as to the personnel of his crew.

This question is nearly a case of first impression. In The Shadwan (D. C.) 49 Fed. 379, affirmed 55 Fed. 1002, 5 C. C. A. 381, the vessel was also at Key West, and it was there impossible lawfully to procure a clean bill of health. The charterer first personally ordered the master to do an impossible thing, viz., procure a clean bill, and then ordered him to proceed to Progresso without it; that port of destination being beyond the charter limits. It was held that:

"In undertaking to send the ship to ports outside of the charter limits, it was the charterer's business, not the owner's business, to get suitable papers; and the persons employed in doing that business were the charterer's agents, whether the master or other persons." 49 Fed. 382.

If it had occurred to Judge Brown that it was the charterer's business to procure a bill of health for a vessel bound within charter limits, it was surely unnecessary to place the decision in The

Shadwan upon the fact that she was sent beyond said limits; for, if the charterer be required to provide and pay for the bill of health within charter limits, a fortiori does such obligation rest upon him when the destination is outside the same, and Judge Brown's entire discussion regarding the arbitrary insistence of the charterer is unnecessary. I think, therefore, The Shadwan is by fair inference an authority for holding that it is the duty of the master, as the agent for the owners, to keep his ship provided with bills of health while engaged on work specifically provided for by the charter party. It may be added that an examination of the record on appeal in 55 Fed. 1002, shows that the pertinent clauses in the charter party there considered were identical with those at bar.

The Nicaragua (D. C.) 71 Fed. 726, lays down the doctrine here asserted; but it cannot be said that the finding was necessary to the point involved in that case. In Lake Steam Shipping Co. v. Bacon (D. C.) 129 Fed. 823, The Shadwan is cited as holding that "ordinarily the charterer is bound to furnish a clean bill of health." The point under discussion was not involved in that case, and, as above indicated, it does not seem to me that The Shadwan asserts any such general rule.

The second question stated must also depend for solution upon the language of the charter alone, if that be possible. The breakdown clause (section 16) plainly declares that, in the event of stranding, "payment of hire shall cease until [the steamer] be again in an efficient state to resume her service"; and the only material inquiry here is when such efficient state again existed. As soon as it did exist, hire began to run again, and no further interruption of payment is to be presumed or inferred in enlargement of the contract of the parties. The Santona (D. C.) 152 Fed. 516.

This action is between owner and charterer only, and, no matter what understandings or agreements existed between charterer and subcharterer or shipper, the charterer must pay the stipulated hire, unless excused therefrom by his own contract, and none other. Accordingly the charterer contends that something else than mere physical efficiency is meant, or that some evidence of actual efficiency is required, other than the assertion of the master. That physical efficiency only is meant by a breakdown clause similar to the one at bar is, I think, clearly inferable from Hogarth v. Miller [1891] A. C. 48.

Nor will the clause in question (section 16) bear, in my judgment, any other construction. It may be difficult to get cargo insurance on a vessel just freed from stranding (of which, however, no proof is offered); but, if there be actual efficiency, that difficulty is not of the owner's making. If the parties to the charter contemplated any other reason for cessation of hire than physical inability to earn it, or intended to give any effect to the opinions or fears of third persons, they should have said so. Nor does this view work injustice or hardship; for, if actual efficiency do not exist, all parties injured by the lack thereof have their remedy against the ship, whose owners, by their tender, warranted fitness to perform. The charterers, therefore, are entitled to no reduction of hire after the date of tender as pleaded in the libel.

The libelants will take a decree, with costs, for the unpaid balance of charter hire only; the off hire period being as stated in the libel.

If the exact amount of the decree cannot be agreed upon with the aid of the memorandum herewith filed, an order of reference will be granted.