## THE CRAIGALLION.

*(District Court, D. Maryland. May 20, 1884.)*

**SHIPPING—CHARTER-PARTY—DAMAGE TO CARGO—LIABILITY OF OWNERS.**

A steam-ship was chartered at a certain hire per month, the owners to appoint and pay the master, officers, and crew, and the charterers to direct what voyages the ship should make, and pay for the coals. The charterers sent the ship to Kingston, Jamaica, to bring back a cargo of green bananas to a port in the United States, and instructed the captain to pay attention to the temperature, and close the hatches whenever the thermometer fell to 50 deg. Fahrenheit, or else the fruit would become chilled and injured. This instruction was neglected, and the fruit was chilled and injured in consequence of the neglect to close the hatches. *Held,* that the master and crew were servants of the owners for the purpose of navigating the vessel, and that, as it was part of the duty of those in charge of the navigation to take usual and proper care of the cargo, the owners were liable to the charterers for the damage.

In Admiralty

*John H. Thomas,* for Henry Bros.

*A. Stirling, Jr.,* for steam-ship.

MORRIS, J. The British steam-ship Craigallion, of 978 tons gross register, was, by charter-party dated September 12, 1883, chartered by the owners to Messrs. Henry Bros. & Co., of Baltimore, importers of fruit, to be placed at their disposal on arrival at New York; she to be then tight, stanch, and every way fitted for the service, with a full complement of officers, seamen, engineers, and firemen for a vessel of her tonnage; the vessel to be employed by the charterers in carrying lawful merchandise between the United States, the West Indies, and South America. The charterers were to pay for the use and hire of the vessel for two months at the rate of 610 pounds sterling per calender month, payable monthly in advance, and to have the option of continuing the charter for a further period of 10 months; the hire to commence on the day of delivey, and to continue until redelivery of the vessel in like good order and condition to the owners, fair wear and tear excepted, (unless lost,) at a port in the United States north of Hatteras. The owners were to provide the captain, officers, engineers, firemen, and crew, and to pay their wages and provisions, also the insurance on the vessel, all engine-room stores, and to maintain the steamer in a thoroughly efficient state in hull and machinery during the service. It was agreed that the captain, although appointed by the owners, should be under the orders and direction of the charterers as regards employment, agency, or other arrangements, and charterers agreed to indemnify owners from consequences of captain signing bills of lading, or otherwise complying with the same. The captain was to prosecute his voyage with utmost dispatch, and render all customary assistance with ship's crew and boats. The master was to be furnished by charterers, from time to time, with all requisite instructions and sailing directions, and was to keep a full and correct log of the voyages, which was to be patent to the charterers or their agents. It was agreed that if the charterers should have reason to be dissatisfied with the conduct of the captain, officers, or engineers, the owners should, on receiving the particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

The charterers were to have permission to appoint a supercargo to accompany the steamer and see that the voyages were prosecuted with utmost dispatch. All derelicts and salvage to be for owners' and charterers' equal benefit. In case of loss of time from deficiency of men or stores, break-down of machinery, or damage, preventing the working of the vessel for more than 48 hours, the payment of hire to cease until steamer should be again in an efficient state to resume her service; but, if steamer was driven into port or anchorage by stress of weather or from accident to cargo, the detention was to be at charterers' risk and expense. In case vessel was lost, freight paid in advance and not earned to date of loss to be returned. Charterers

were to have at their disposal the whole reach of the vessel's holds, decks, and usual places of loading, (not being more than she could reasonably stow and carry,) reserving proper space for officers, crew, tackle, stores, fuel, etc. The charterers agreed to pay for all coals, port charges, pilotages, agencies, and other charges except such as owners had agreed to pay. The owners were to have a lien upon all cargoes and all subfreights for any amounts due them, and the charterers to have a lien on the ship for all moneys paid in advance and not earned.

Under this charter-party the steamer was placed at charterer's disposal in New York on the nineteenth of September, 1882, and under their direction took on a cargo of locomotive machinery and delivered it at Aspinwall. Thence she went to several ports in Jamaica, taking in cocoa-nuts and oranges, and completed her return cargo at Kingston by taking on board 6,400 bunches of bananas. There was no supercargo put on board, and before leaving New York the charterers explained to the master that the bananas, which he was to bring back as part of the return cargo, would be injured if they became chilled, and instructed him to close the hatches if the temperature at any time on the voyage fell below 50 deg. Fahrenheit. Before the steamer left Kingston the charterers telegraphed their agents there to repeat this instruction to the master, which they did. The steamer arrived at the capes of the Chesapeake about the fifteenth of November. From the time of leaving Kingston until the steamer took a pilot inside Cape Henry the captain himself gave attention to the thermometer, and it stood at 60 outside the capes, but when the pilot took charge, the captain, being sick and suffering from a fever, went below, having given instructions to his first officer to observe the temperature and close the hatches if the thermometer fell below 50 deg. During that night on the Chesapeake bay the temperature fell to 38 deg., and the first officer neglected to have the hatches closed. When the steamer was ready to discharge on the 17th, it was found that the bananas, although otherwise in exceptionally fine condition, had been chilled. This was evidenced to observation by a slight brown discoloration on the green skins where the bananas touched each other, and was proved conclusively by the fact that the bananas did not ripen, but turned black and rotted, becoming so utterly worthless that quantities of them had to be carted outside of the city and thrown away. The actual net loss sustained by the charterers, from this damage to the bananas, was $7,383.

These are cross-libels, the owners of the ship having sued for the hire of the ship, and the charterers for the damage sustained by the fruit. There is no difficulty whatever as to the facts of the case, and the only question is as to the legal liability. This is a charter by which the ship, fully equipped and manned, is let to hire, and it must be regarded as settled that under such an instrument as the present charter the possession and the responsibility for the naviga-

tion of the ship remains with the owners. *Leary* v. *U. S.* 14 Wall. 607; *Reed* v. *U. S.* 11 Wall. 600; Macl. 328; Abb. (12th Ed.) 36. The officers and crew were appointed and paid by the owners, and they were their servants to see to the navigation and direct the motions of the ship; the charterers were only to direct to what places she should go.

The case of *Onoa & Cleland Coal & Iron Co.* v. *Huntley*, L. R. 2 C. P. Div. 464, (1877,) arose upon a charter in substance identical with the present one. In that case, while upon a voyage, by the negligence of, the master and crew, the vessel was stranded and went to pieces, and the cargo was totally lost. It was held that the master and crew were the servants of the owner for the purpose of navigating the vessel, and that he was liable to compensate the charterers for the loss of the cargo sustained by them. Mr. Justice DENMAN, in pronouncing judgment in the common pleas division, said:

"A person who contracts to provide workmen or seamen to perform a specified undertaking is bound to make good any injury which the other party to the contract may sustain from omission to perform their duty in a proper manner. Here, these who were employed by the defendant (the owner) have, by their negligence, inflicted an injury upon the plaintiffs, who are entitled to recover from him compensation for the loss."

Taking this to be the law applicable to such a charter-party, the only question is, was the duty with regard to this cargo of fruit which the master of the ship undertook to perform, and which his subordinates neglected, one of the usual and proper duties to be performed by those in charge of the navigation of the ship, in relation to such a cargo.

It is stated by Abbott, (12th Ed. p. 316, pt. 4, c. 5, § 4:)

"Moreover, the master must, during the voyage, take all possible care of the cargo. If it require to be aired or ventilated, as fruit and some other things do, he must take the usual and proper methods for this purpose."

It is urged that there is no express contract to carry safely, and that there is no breach of any clause of the charter-party, but almost every contract establishes duties which are not specifically mentioned, and the neglect of which gives an action. There was not in this case, it is true, the obligation of a common carrier to carry safely, but surely there was the obligation resting on those in charge of the navigation of the ship to use ordinary care and diligence in the care of the fruit. It was a well-known duty to open the hatches for ventilation, and how can it be contended that it was not equally a duty, and within the usual and necessary scope of their employment, to close the hatches when necessity arose. If the hatches had been negligently left open when the violence of the sea required them to be closed, that duty could not be said to be beyond the usual duties of those charged with the navigation of the ship; and in the present case, having been instructed that a certain and easily observable degree of cold would destroy the value of the bananas, and having un-

taken to give the necessary attention to guard against this danger by a timely closing of the hatches, how can it be said that this was not as much within the duty of protecting the cargo as to close the hatches to keep out the sea.

In *The Regulus*, 18 FED. REP. 380, under a charter-party in which it was provided that the ship should be "in every way fitted for the voyage, and that the hatches were to be taken off, whenever practicable, as usual for the ventilation of green fruit," it was held a breach of the charter for the owner to load the vessel with other cargo so deeply that in rough weather the hatches had to be kept on more than was fit or usual with such cargoes. If, then, it be the law, as I think clearly it is, that the owners were liable for the neglects of the officers and crew in any duty appertaining to the navigation of the ship, and the proper care of a fruit cargo is such a duty, I see no escape from the conclusion that in the present case the ship is liable.

A decree will be entered for the amount of the damage to the bananas, less the freight claimed in the cross-libel.