ANDERSON *v.* THE ASHEBROOKE *et al.*

*(Circuit Court, E. D. Texas. December 1, 1890.)*

1. INJURY TO EMPLOYE—CONTRIBUTORY NEGLIGENCE.
     The only way for getting into the hold of the vessel which libelant was employed in loading was by a ladder, so placed in a hatch that to reach it one was obliged first to step onto the steam-winch used in lowering the freight. The winch was out of repair, so that it would not quickly obey the lever, and was unreliable in holding a suspended load. Libelant, without giving any notice, or making any inquiry, stepped on the winch while a load was suspended on the tackle. His stepping on the winch, together with the suspended load, set it in motion, from which he received severe injuries. Libelant knew, or should have known, that it was customary to lower the freight part way, and then hold it until those below were ready for it. *Held* that, though it would not have started had it not been out of repair, libelant was still guilty of contributory negligence.

2. SAME—DEFECTIVE APPLIANCES—LIABILITY OF VESSEL.
     Though the ship had been chartered for a lump sum, and by the charter-party, the charterers were to pay the stevedoring and the loading, still the owners of the vessel, having by the charter-party contracted to furnish the use of tackle in loading, and to afford charterers the same accommodation as if the ship had been loaded by the pound, were bound to the charterers, and the charterers' agents, the stevedore and his employes, to furnish proper machinery and tackle, and to use proper care to keep it in order.

3. SAME—CONTRIBUTORY NEGLIGENCE—DIVISION OF DAMAGES.
     In admiralty, contributory negligence on the part of libelant is not a bar to his recovery for personal injuries, but both parties being at fault the damages are apportioned.

4. SAME—NEGLIGENCE OF FELLOW-SERVANTS.
     The fact that libelant's fellow-servants were negligent, will not prevent recovery, there having been negligence on the part of the ship.

In Admiralty.
*James B. & Charles B. Stubbs,* for libelant.
*McLemore & Campbell,* for claimant.

PARDEE, J. December 28, 1888, John Anderson, cotton screwman, went to work, having been employed, with others, to load with cotton the British steam-ship Ashebrooke, then lying at the port of Galveston. J. Moller & Co. were the charterers of the ship for a lump sum under a charter-party which provided that the charterers were to pay for compressing cotton and stevedoring, but the vessel should furnish the use of her tackle in loading, and to trim and discharge her ballast as charterers may desire, at her expense, and to afford charterers the same accommodations as if loaded by the pound. Charterers contracted with the firm of Sweeney & Co., stevedores, to load the vessel. Sweeney & Co. hired Anderson to assist in the work. Anderson was first employed in the work of slinging cotton aboard from the wharf; but, having finished that employment, under directions, started, with others, aboard the ship to go down into the hold to assist in stowing away cotton already sent down. The means provided by the ship for Anderson and his comrades to go down below was through a hatch, which was in use for lowering cotton by means of a tackle operated by a steam-winch, or hoisting apparatus. The combing, or guard, of the hatch, was from two to three feet high, and the only means of descent from the deck into the hold was through this hatch by an iron ladder, which was fastened or bolted to the forward end of the hatch about amid-ships, and at the same end of the hatch as the winch. The winch extended almost entirely across the end of the hatch, and was so close thereto that there was no room for any one to pass between in order to reach the ladder; and any one descending into the hold was obliged to step over and upon a part of the winch. At the time, said winch was out of repair by reason of defective packing, so much so that quantities of steam escaped, and it would start unexpectedly, and would not promptly obey the lever which was used for starting and stopping, but would continue to revolve after the steam was turned off, and the lever was on the center; and was uncertain and unreliable in holding a load suspended preparatory to its dumping in the proper place. At the time Anderson went aboard, the winch was still, the steam turned off, and the lever was on the center; the tackle, being at that time loaded with bales of cotton partially lowered into the hold, stopped a short distance from the bottom, waiting for directions to dump at the proper time and place. The man at the lever of the winch was watching the foreman of the hatch for the signal to start it, and the foreman was looking down into the hold to see when the men below wanted the load lowered the rest of the way. Without giving any notice of his intention of going down into the hold, and without ascertaining whether any load was suspended on the tackle, and without being noticed by the men in charge, Anderson stepped across by and upon the winch in the usual way to reach the ladder. As he did so it suddenly started, without any act on the part of the man in charge of the winch or the foreman; probably set in motion either by the weight of the sling load of cotton suspended in the ship's hold, or by Anderson stepping upon it, or from both causes combined. When it started

it caught Anderson's leg between the projecting end of the piston-rod, as it rapidly revolved, and the combing of the hatch; and crushed and broke his leg; at the same time threw him against other parts of the machinery, tore the flesh from and lacerated the upper part of the leg, or thigh; and, in short, caused such severe injuries that, after months of pain and suffering, his leg was necessarily amputated. It further appears that, prior to the injury of Anderson, complaint was made to the engineer of the vessel of the defective state of the machine, with a request to have it repaired, which request was refused. In this case, Anderson claims damages against the ship for his injuries; and, from a decree in his favor, allowing him $3,000, the claimant has appealed.

It seems clear from the evidence that the libelant, Anderson, was guilty of negligence and carelessness, without which he would not have been injured. He knew, or ought to have known, that while the winch was in operation, the danger of attempting to go down into the hold was largely increased; he knew, or ought to have known, that in using the winch for lowering cotton in the hold it was customary to lower the sling load of cotton part of the way, and there hold it till the men below were ready to receive it. Before he attempted to go down into the hold, he should have notified the parties in charge of the winch of his intention, and should have ascertained whether the winch was temporarily stopped because it had discharged its load, or because it was holding the load ready for discharge. Proctor for libelant contends that libelant was not guilty of negligence in not giving notice of his intention to descend into the hold, because any notice that he could have given would have been of no avail, as the starting of the winch was from causes independent of the man at the lever, and the same thing would have happened if there had been notice. It is very probable that if libelant had given notice of his intention to go down at the time, and had persisted in the intention, the result would have been practically the same; but it seems clear that if he had given notice he would have been informed of the condition in which the machinery was, and of the position in which the sling load of cotton was, and would have been directed to wait until the load had been discharged, and the machinery thus put in comparatively safe shape. If he had taken the trouble to ascertain the condition in which the winch was stopped, with a sling load of cotton suspended, common sense would have told him not to climb onto the machinery and attempt to descend into the hold until the condition of both machinery and suspended load was changed. Upon the evidence, there seems to be no difficulty in reaching the conclusion that the means provided for workmen employed, as was Anderson, to go down into the hold to work was extremely dangerous because of the location of the ladder with reference to the steam-hoisting apparatus; and because the steam-hoisting apparatus, near which it was necessary to go in order to get down into the hold, was out of repair, and not in safe and suitable condition with reference to the people who were employed to work in connection with it. Proctor for claimants contends that, although the location of the ladder

with reference to the steam-hoisting apparatus was dangerous, and although the steam-hoisting apparatus was out of repair, yet the ship is not liable, because:

"(1) The owners of the vessel are not liable to the employe of a stevedore, who has full charge of the loading of a ship, for injury to the employe caused by defective tackle and machinery furnished by the ship, when it is shown that the tackle and machinery had no such defects as were known to the owners or master of the ship; and that the stevedores were experienced, and had exclusive control of the work; and that the owners are not liable for injuries caused by defect in tackle or machinery, arising from wear and tear, unless a knowledge of such defect is brought home to them."

Reliance is placed upon the case of *The Dago*, 31 Fed. Rep. 574, and authorities there cited. Conceding the law to be as stated, the defense is not good in this case, because the improper location of the ladder and steam-hoisting apparatus was so patent that the court is bound to hold that the owners had notice of it; and the evidence in the case shows that the defective machinery, arising from wear and tear, was brought home to the agents of the owners by actual notice.

"(2) There was no privity of contract between Anderson, the libelant, and the steam-ship Ashebrooke, but if there had been, the master and owners are not insurers or warrantors of the machinery; their duty is to use proper care, and provide machinery and tackle fit for use."

It is true there was a charter-party for a lump sum from the owners of the ship to Moller & Co., and that under such charter-party the charterers were to pay for the stevedoring, and, inferentially, the loading of the ship. The charter-party was not a demise of the ship, but a mere contract of affreightment, and under it the loading was for the direct benefit of the ship. Moreover, under it, the owners contracted to furnish the use of tackle in loading, and to afford charterers the same accommodations as if the ship had been loaded by the pound. Under this charter-party, the appliances and tackle were furnished directly by the ship to the charterers, and to the charterers' agents, the stevedore and his employes. They were bound to furnish machinery and tackle fit for use, and to use proper care to keep the same in order. See *The Max Morris*, 24 Fed. Rep. 860, 28 Fed. Rep. 881; *The Rheola*, 19 Fed. Rep. 926; *The T. A. Goddard*, 12 Fed. Rep. 174. The evidence in this case shows that the ship did not use proper care to provide tackle and machinery fit for use, and keep the same in a proper state of repair.

"(3) The libelant, Anderson, was the immediate cause of the accident, and he cannot recover."

In the admiralty, contributory negligence does not necessarily prevent the recovery of damages by a party injured in case of maritime tort occasioned by concurring negligence. In such cases the admiralty rule is to divide the damages. This court fully considered this question in the case of *The Explorer*, 20 Fed. Rep. 135, where it is held that "in cases of marine torts it is the rule of the courts of admiralty to exercise a conscientious discretion, and give or withhold damages upon enlarged principles of justice and equity." And in the well-considered case of *The Max Morris*, 28 Fed. Rep. 881, following *The Explorer*, it was held that—

"In suits in admiralty for personal injuries, contributory negligence on the part of the libelant is not a bar to his recovery; and that the admiralty rule apportioning damages, where both parties are in fault, extends to all causes of maritime tort occasioned by concurring negligence."

"(4) The machinery of the Ashebrooke, as operated, was well known to the fellow-servants of the libelant, and particularly to the foreman and employer of the libelant, and the same was continued to be operated by them and all of them; and if there had been any defect on the part of the machinery, it was negligence on the part of such fellow-servants to continue its use; and where machinery is defective, so that otherwise a recovery might be had for an injury received, yet, if the promoting cause of the injury is the negligence of a fellow-servant, no recovery can be had: and in this case, all the evidence shows that the foreman well knew that the steam had to be relied on to hold the load of cotton."

The trouble with this position is that, under the evidence in the case, the promoting cause of the injury, so far as the ship was concerned, was its defective appliances and tackle. It does not relieve the ship from fault, because fellow-servants of the libelant contributed with him to the injury. If his own contributory negligence is no bar to his recovery, it is difficult to see why the contributory negligence of his fellows should cut him off. Under all the circumstances of this case, there is no doubt that the owners of the ship were guilty of negligence in connection with the injury to the libelant, for which the ship is responsible *in rem*, (see *The A. Heaton*, 43 Fed. Rep. 592;) and the court is of the opinion that the admiralty rule in regard to the division of damages in the case of mutual fault should be followed in this case. It appears from the evidence that the libelant is a comparatively young man, with a family dependent upon him for support; that his pain and suffering were great for months; that his injury finally resulted in the loss of a leg, very greatly diminishing his capacity for labor in the future; that his earning capacity was about $1,000 per year. Considering libelant's loss of time, (nearly a year;) his diminished earning capacity; his expenses for surgical and medical attendance, and medicines; his pain and sufferings, and the loss of his leg,—his damages clearly amount to the sum of $6,000; and if he had been shown to have been without fault in this case, that amount would have been a proper allowance for damages. Applying the rule for the division of damages, the court is of opinion that $3,000, the sum allowed libelant by the district court, is not excessive, but is a just and equitable allowance; and this not as a reward to libelant for his own negligence at the expense of the ship, nor as a compensation for the injury he has received, but as a just method of enforcing the admiralty rule requiring a division of damages in cases of maritime tort resulting from mutual fault, and of compelling a party, without whose fault there would have been no injury, to bear his just share of the damages. A decree will be entered in favor of libelant for $3,000, with legal interest from the date of the decree appealed from.