## THE NICARAGUA.

### ORR & LAUBENHEIMER CO., Limited, v. THE NICARAGUA.

(District Court, S. D. Alabama. April 11, 1895.)

No. 693.

1. CHARTER PARTY—WHEN SHIP IS DEMISED.

By a charter party the owners were to provide all provisions, wages, consular, shipping, and discharging fees of the officers and crew, pay for insurance of the vessel, and for all room and deck stores, maintain the ship in efficient working condition, and victual and provide for all passengers,—charterers paying a fixed sum for each passenger per day. The charterers were to provide coal, pay port charges, pilotages, agencies, and commissions, and expenses or lading, but were not to be responsible for improper stowage. They were to have at their disposal all the steamer's holds and decks, and all places of loading and passenger accommodation, reserving only sufficient space for the crew, tackle, provisions, stores, and fuel. The captain was to be appointed by the owners, but to be at the direction of the charterers in respect to employment, agency, or other arrangements. *Held,* that this was not a demise of the vessel, as the owners did not part with the possession, command, and navigation of her.

2. SAME—AGENCY OF MASTER.

Under such charter party the captain was the agent of the owners of the vessel, and it was his business to get suitable papers and proper entrance permits to the ports within the charter limits; and any error or default of his in that respect was chargeable upon the owners.

3. SAME—LIABILITY FOR LOSS OF CARGO.

A steamer was chartered, by a charter party not amounting to a demise, expressly to carry perishable cargoes of fruits, etc., from Central America to Mobile. The charter party provided that the master should prosecute the voyages with the utmost dispatch, and that the steamer should not stop to assist or tow any vessel liable to cause detention, except for the purpose of saving human life. At Bluefields, Nicaragua, the master took on board as a passenger, without the direction of the charterers' agent, a person not in danger of his life, who was without the health certificate which the master knew was required by the quarantine authorities at Mobile; and for lack of such certificate the vessel was detained in quarantine at that place until the cargo was lost by deterioration. *Held,* that the ship was liable therefor to the charterers.

This was a libel in rem by the Orr & Laubenheimer Company, Limited, against the Norwegian steamship Nicaragua, to recover under a charter party for the loss by deterioration of perishable cargo during detention of the vessel in quarantine at the port of Mobile.

Libelants, fruit importers at Mobile, Ala., were the charterers of the steamer Nicaragua. She was chartered under a time charter party made in New Orleans, La., for the tropical fruit trade,—that is to say, to bring bananas and like fruit to Mobile from Central America,—and the carrying of any lawful merchandise and passengers, as far as accommodations would allow, as the charterers or their agents should direct. The charter party, among other things, provided that:

"(1) That the owners shall provide and pay for all provisions, wages, and consular, shipping, and discharging fees of captain, officers, engineers, firemen, and crew; shall pay for the insurance of the vessel; also for all engine room and deck stores; and maintain her in a thoroughly efficient state, in hull and machinery, for and during the services, guarantying to maintain the boilers in a condition to bear a working pressure of at least 80 pounds (and this pressure to be carried continuously), during the whole

term of this charter; and victual and provide for all passengers in the best manner according to their class, charterers paying at the rate of one dollar and fifty cents per day for each first-class passenger, and one dollar per day for laborers and second-class passengers.

"(2) That the charterers shall pay and provide for all the coal, port charges, pilotages, agencies, and commissions, and the charterers shall accept and pay for all coal in the steamer's bunkers on delivery, at the current market rate of New Orleans per ton, and the owners shall, on expiration of this charter party, pay for all coal left in bunkers at the current market prices at the respective ports where she is delivered to them. It is understood that the steamer .must have sufficient coal in bunkers on delivery to take her to a United States Gulf port.

"(3) That the charterers shall pay for the use of said vessel (£475) four hundred and seventy-five pounds sterling, lump sum, per calendar month, commencing from noon of Monday, August 14th, after the vessel is ready as above, and reported at the custom house, and placed with clear holds at charterers' disposal, and at and after the same rates from any part of a month, hire to continue from the time specified for terminating the charter until her delivery to owners (unless lost) at a port in United States.

\* \* \* \* \* \*

"(6) That the cargo or cargoes shall be laden and [or] discharged by charterers at their expense, under the direction of the master, but charterers shall not be responsible for improper stowage with the assistance of the steamer's crew and tackle in any docks and [or] at any wharves and [or] places that the charterers or their agents may direct, provided the steamer can always safely lie afloat at all times of tide.

"(7) That the whole reach of the steamer's holds, decks (consistent with seaworthiness), and all places of loading and passenger accommodation of the steamer (not being more than she can reasonably carry and stow), shall be at the charterers' disposal, reserving only proper and sufficient space for the ship's officers, crew, tackle, provisions, stores, and fuel.

"(8) That the captain shall prosecute his voyages with the utmost dispatch, and take every advantage of wind, by using the sails, with a view to economize fuel, and shall render all possible assistance with ship's crew and boats.

"(9) That the captain, although appointed by owners, shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with their orders and directions.

\* \* \* \* \* \*

"(11) That the charterers shall have permission to appoint a supercargo, who shall accompany this steamer, and be furnished, free of charge, with same fare as captain, and accommodations in cabin, and to see that voyages are prosecuted with the utmost dispatch.

"(12) That the master shall be furnished from time to time with all requisite instructions and sailing directions, and shall keep a full and correct log of the voyage or voyages, which are always to be open to the inspection of the charterers or their agents. .

\* \* \* \* \* \*

"(14) That in the event of loss of time from deficiency of men and stores, want of repairs, breakdown of machinery, or stranding, or damage or other causes appertaining to the duties of the owners, preventing the working of the steamer in her ordinary capacity for more than twenty-four hours, the payment of hire shall cease until she be again in an efficient state to resume her service, and should she, in consequence of such deficiency, want of repairs, breakdown, or other causes, put into any port other than that to which she is bound, the port charges, pilotages, etc., at such ports shall be borne by the steamer's owners; but should the vessel be driven into port or to anchorage by stress of weather, or from any accident to the cargo, such detention or loss of time shall be at the charterers' risk and expense. Also, if any loss of time, from crew or stores not being on board in time,

or from repairs to hull and machinery, which are for owners' account, not being complete after cargo and coals are on board, and hour of sailing has been fixed by charterers, and notice given to captain, the time lost is for steamer's account.

"(15) That should the vessel be lost, any hire paid in advance, and not earned (reckoning from the date of her loss), shall be returned to the charterers, with interest from date of loss. The act of God, public enemies, fire, restraints of princes, rulers, and people, and all other dangers and accidents of the seas, rivers, machinery, boilers, and steam navigation throughout this charter party always excepted.

\* \* \* \* \* \*

"(26) That on account of the perishable nature of the cargoes that this steamer is intended to carry, she is not allowed to stop to pick up any wreck, or in any way assist or tow any vessel, when by so doing she is liable to be detained, unless only in order to save human life. All salvages and derelicts for owners' and charterers' joint benefit in equal shares.

\* \* \* \* \* \*

"(28) The steamer must provide a crew consisting of men who have had yellow fever, or have been in places where yellow fever has been epidemic to such extent as will satisfy the board of health that they are acclimated. The ship and crew must in all respect be such as will meet the requirements of the Louisiana state board of health.

"(29) Penalty for nonperformance of this contract, estimated amount of damages."

The vessel was originally chartered to Steinhardt & Co. on August 21, 1893, for six months, and this charter was on the same day transferred by indorsement in writing to Orr & Laubenheimer, the predecessors of the Orr & Laubenheimer Company, who, in their turn, turned over all the assets of their firm to the said Orr & Laubenheimer Company, a corporation, in July, 1894. No new charter party or written extension of the old charter party had been entered into at the expiration of the six months for which the vessel was originally chartered; but the vessel was nevertheless used and run as before for the said Orr & Laubenheimer Company, they paying the same hire as they had hitherto done during the six months succeeding the expiration of the charter, according to the terms of the original charter. Libelants, in August, 1894, shipped on the said steamer at Bluefields, for Mobile, and consigned to themselves, a cargo of bananas. This was during the quarantine season on the Gulf coast of the United States. G. Nicolaysen was the master of the said steamer. He was familiar with the quarantine regulations at Mobile, which required detention and fumigation of ships at that period of the year, arriving with passengers not specially authorized by the quarantine authorities to enter, and was familiar with the perishable quality of the cargo in his vessel's hold. He brought, on that voyage to Mobile, against the remonstrance of the quarantine agent at Bluefields, a person by the name of John McCafferty, who appears to have been a newspaper correspondent, and an emissary of certain foreign residents of the Mosquito Reserve, to the United States. The consequence of this act of the said master in bringing this person without authority of the quarantine board was the detention of the vessel, and the alleged loss to the owners of the cargo by its deterioration, and it was for this loss that they brought their suit against the vessel.

Pillans, Torrey & Hanaw, for libelants.

Gregory L. & H. T. Smith, for claimant.

TOULMIN, District Judge. On due consideration of the evidence and the law applicable thereto, I have reached the following conclusions:

1. That the charter party, on which this suit is founded, was not a demise of the vessel. By its terms the general owner did not part with the possession, command, and navigation of the vessel.

The language used shows no intent to transfer such possession, command, and control. The contract was for the use of the vessel by the charterers for a specified period of time. Reed v. U. S., 11 Wall. 591; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519; Leary v. U. S., 14 Wall. 607; Donahoe v. Kettell, Fed. Cas. No. 3,980; Drinkwater v. The Spartan, Fed. Cas. No. 4,085; Iron Co. v. Huntley, 3 Asp. 501.

2. That the captain was the agent of the owner of the vessel, whose business it was to get suitable papers and proper entrance permits to the ports within the charter limits, and that any error or default of the master in that respect is chargeable upon the owner.

3. That in August, 1894, there was a regulation of the Mobile quarantine board, in force in the port of Mobile, which required passengers from Bluefields to have a health certificate or entrance permit from the quarantine physician at Bluefields, in default of which any vessel bringing such passengers would be detained at the quarantine station.

4. That the captain of the Nicaragua had knowledge of such regulation, and with such knowledge brought the passenger, McCafferty, on his vessel from Bluefields to Mobile without the required certificate or permit.

5. That John A. Petersen was the agent of the libelants at Bluefields, with authority to receive the fare or passage money from passengers coming to Mobile on the steamer Nicaragua, and other steamers chartered and operated by the libelants in the same trade, and perhaps with authority to order or direct the captains to bring passengers. That in this instance he did not order or direct the captain of the Nicaragua to bring McCafferty as a passenger.

6. McCafferty testifies that he paid the money for his passage to Petersen, and that Petersen promised to make all necessary arrangements for his passage, and sent him aboard of the Nicaragua. Petersen denies this. The weight of evidence tends to support Petersen, at least on the issues as to the payment of the passage money to him, and as to sending him aboard of the vessel; and it is clear that Petersen did not make the necessary arrangements for McCafferty's passage to Mobile, whatever his promises or statements on that subject may have been. McCafferty testifies that, subsequent to Petersen's promise to make the necessary arrangements for his passage on the Nicaragua, he met Capt. Wiltbank, and in speaking to him about his passage said to him, "How about quarantine?" Wiltbank replied, "Petersen and myself can fix that." It appears from the evidence that they did not fix it, and that the captain of the Nicaragua knew this when he took McCafferty as a passenger.

7. The master of a vessel may deviate, by going out of his course, or by delaying, in order to assist or save the lives on board another vessel in distress, or otherwise in peril from shipwreck. Not only does the law of the land and humanity demand this, but the charter party in this case provides for it. The respondent invokes this provision of the charter party, and also the principles of law

and humanity referred to as a justification for bringing McCafferty from Bluefields to Mobile without the quarantine physician's certificate or permit, and insists that this is a complete answer to the libelants' claim for the damages alleged to have been occasioned by reason of the vessel's delay at the quarantine station. McCafferty was not shipwrecked. He was not on board another vessel in distress. The deviation, if it be a deviation, was not to assist or save his life. He says that he went on board the Nicaragua "as the representative of the American residents of Bluefields; that they proposed to him to return to the United States and champion their cause there; and that he reluctantly agreed to do so." It was on this mission, then, that he desired and took passage on the Nicaragua, and not to save his life. It does not satisfactorily appear that his life was in danger. He was told that some person had said to one of his friends that he had better "look out, or he will get himself into a hole in the ground," and it appears that there were some threats against him by personal enemies, and it also appears that some American citizens, resident there, had been threatened with arrest and deportation, and McCafferty may have been one of the number thus threatened; but, so far as the evidence shows, the idea that he desired and sought passage on the Nicaragua to the United States to save his life arose after he was aboard the vessel, and when it appeared that he would not get the certificate or permit from the quarantine physician, and it was doubtful whether the captain of the vessel would take him without such permit. Then it was that appeals were made in his behalf, and the captain yielded and decided to take him. In the ordinary course of the voyage a deviation by the vessel to save life at sea is justifiable; but the particular circumstances of this case do not present such a case of deviation. The Wells City, 10 C. C. A. 123, 61 Fed. 857; Carv. Carr. by Sea, § 292.

8. "One of the fundamental conditions of the contract was the obligation of the ship owner to be diligent in carrying the goods on the agreed voyage, and to carry them directly without any unnecessary deviation." The Wells City, supra. This obligation must be made good, unless prevented by the act of God, the law, or by the libelants. The B. F. Bruce, 50 Fed. 123.

9. That the cargo of the Nicaragua was of a perishable nature, and that the master knew, or had reason to know, that it must necessarily suffer some decay or deterioration from delay in its transportation.

10. That the respondent has failed to satisfy the court that the delay here complained of was caused by the act of God, the law, or by the libelants. That the delay was caused by the act of God is not claimed, and that it was caused by law, or by the libelants or their agents, cannot be maintained on the particular facts of the case. The vessel must therefore make compensation for the loss inflicted on the cargo by the detention and delay complained of. This being unknown to the court, a reference must be had to ascertain it. In the Shadwan Case, 49 Fed. 379, to which the court's

attention was particularly called by the respondent, the whole trouble grew primarily out of the charterer's diversion of the ship from the charter limits. He by a subcharter provided that the ship should go to a port outside of the charter limits. The court said:

"In undertaking to send the ship to ports outside the charter limits, it was the charterer's business, not the owners' business, to get suitable papers, and the persons employed in doing that business were the charterer's agents, whether the master or other person. In diverting the ship to ports not allowed by the charter, the charterer took the risk of securing to the ship the proper entrance permits, and is not entitled to charge any error of the master in that respect, if there was any, upon the owners. * * * The owners were under no duty to obtain papers for Progresso [the port outside the charter limits], since they never authorized the ship to go there; and the master's defaults, if any, in dealing with the charterer in that regard, did not become the defaults of the owners."

—Which clearly implies that if the vessel was operating and entering ports within the charter limits, it was the owners' business to get suitable papers or proper entrance permits, and that any error or default of the master in that respect would be chargeable upon the owners. The charter in that case, like the one in this, provided that "the captain shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements." This stipulation bound the master to observe any arrangement about the employment of the vessel, and any agency selected or authorized for the vessel, or other arrangements of that kind by the charterers, and if the libelants, or their duly-authorized agent, had made an arrangement for the passage of McCafferty on the Nicaragua, and had ordered or directed the captain to take him as a passenger to Mobile, it would have been the duty of the captain to observe such arrangement, and to have obeyed the orders in respect thereto. Such is not this case, as made by the evidence. It shows a case of error on the part of the master, which, in my opinion, is chargeable upon the owner.

A decree will be entered for the libelants.