THE DEL NORTE.

CRESCENT CITY TRANSP. CO. v. TOWNSLEY.

(District Court, D. Washington, N. D.   October 31, 1901.)

1. SHIPPING—CHARTER DEMISING SHIP FOR TERM—LIABILITY FOR WRONGFUL ACT OF OFFICERS.

By a time charter the owner agreed to let and hire to the charterer the whole of a steamship, with her tackle, apparel, furniture, etc., for the term of four months, at a stated rental, to be employed by the charterer between the port of Seattle and Alaskan ports. She was to be delivered to the charterer at Seattle in good order and repair, and redelivered to the owner there at the end of the term in the same good condition, with certain exceptions of usual wear and tear and damages arising from sea perils and inevitable casualties. The charterer was to have "full charge of the vessel during the continuance of the charter party"; to pay all bills and expenses incurred in her operation, including the wages of the master, officers, and crew; to protect her from all liabilities, and to have all her earnings of whatever description. The master, chief engineer, and steward were to be appointed by the owner, but "to be in all respects under the orders and direction of the charterer," and subject to removal on his complaint, if found to be justified.

It was further provided that, in case the charterer should fail to pay the rental at the times specified, or the operating expenses, including wages, the owner should have the right to retake possession, and that on his request the master should hold possession of the ship as his representative. *Held*, that such charter constituted a demise of the vessel, which placed the charterer in possession, as owner, for the voyages made during the term, and that he could not hold the vessel liable by a proceeding in rem for loss or damages occasioned by the malfeasance or wrongful acts of the master or steward while so in his service.

2. SAME—CONSTRUCTION OF CHARTER.

A provision of such charter, giving the master authority to control the operations of the vessel in towing barges, and expressly exempting the owner from liability for the abandonment of any tow where, in the judgment of the master, the safety of the vessel required such abandonment, did not confer on the master any powers he would not otherwise have had, nor change the relation of the charterer to the ship as owner pro hac vice, and it gave him no claim on the vessel on account of the wrongful act of the master in abandoning a barge without necessity.

In Admiralty.

This is a suit in rem against the steam schooner Del Norte, and in personam against her owner, by T. F. Townsley, libelant, to recover damages for alleged losses resulting from misconduct of the captain and steward of the vessel while she was in his service under a charter party, and for breach of the contract contained in the charter party by withdrawing the vessel from the charterer's service before the termination of the period for which she was hired. The owner of the Del Norte filed a cross libel in personam against the libelant to recover a balance alleged to be due for hire of the ship under the charter party. Decree for the respondent and cross libelant.

Pratt & Riddle and James Kiefer, for libelant.

Preston, Carr & Gilman, for claimant and cross libelant.

HANFORD, District Judge. After rendering a decision upon the merits in these cases, the court granted a rehearing and admitted further proof, and now, upon due consideration of the additional evidence and arguments, the court finds it necessary to revise its decision.

The amended libel alleges losses to the charterer, of which I have made the following condensed statement:

| | |
|---|---|
| Beef and potatoes negligently wasted | $ 2,048 99 |
| Barge Mildred abandoned at Juneau | 4,000 00 |
| Two days' unnecessary detention at Juneau of steamer | 500 00 |
| False expense voucher | 257 50 |
| Four days' unnecessary detention at St. Lawrence Bay | 1,000 00 |
| Failure to collect freight on goods carried from St. Lawrence Bay to Unalaklik | 3,000 00 |
| Two days' unnecessary detention at Dutch Harbor | 500 00 |
| Cash collected for extra meals and retained by captain | 112 50 |
| Removal of cabins and reduction of passenger accommodations, and knocking down of fares by captain | 15,636 00 |
| Carrying passengers and freight gratis | 685 00 |
| Two anchors and one winch removed from barge Mildred | 125 00 |
| Stores confiscated when steamer was taken from charterer's possession | 300 00 |
| Wrongfully taking steamer from charterer 27 days before expiration of charter | 10,000 00 |

That part of the libelant's claim which is for losses alleged to have been caused by or resulting from the incompetence and mis-

conduct of the captain and steward is based upon an assumption that the master and steward must be considered as agents of the general owner, and that the ship and owners are liable to the charterer for all losses and damages arising either from their incompetence, or malfeasance in their respective stations. The claimant and cross libelant repudiates the agency of the captain and steward during the time the vessel was in the service of the charterer, and insists that those officers were the charterer's servants, and that the vessel cannot be held liable to the charterer for any loss occasioned by their incompetence or misconduct, and that there can be no personal liability of the owner for such loss. Therefore the question as to which of the contending parties must suffer for the alleged mismanagement of the vessel while she was in the charterer's service must be decided before it becomes necessary to investigate the charges made against the officers, and the relation of the parties towards each other and towards the officers intrusted with the management of the vessel must be ascertained and fixed by a true interpretation of the charter party. In the opinion of the supreme court, by Mr. Justice Clifford, in the case of Reed v. U. S., 11 Wall., 591–600, 20 L. Ed. 220, it is stated that:

"Affreightment contracts are of two kinds, and they differ from each other very widely in their nature, as well as in their terms and legal effect. Charterers or freighters may become the owners for the voyage, without any sale or purchase of the ship, as in the cases where they hire the ship, and have, by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command, and navigation of the ship, and contracts for a specified voyage,—as, for example, to carry a cargo from one port to another,—the arrangement in contemplation of law is a mere affreightment sounding in contract, and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership. Unless the ship herself is let to hire, and the owner parts with the possession, command, and navigation of the same, the charterer or freighter is not to be regarded as the owner for the voyage, as the master, while the owner retains the possession, command, and navigation of the ship, is the agent of the general owners, and the mariners are regarded as in his employment, and he is responsible for their conduct. Courts of justice are not inclined to regard the contract as a demise of the ship, if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer; but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and, if need be, he may appoint the master, and ship the mariners, and he becomes responsible for their acts."

The same distinction and the same rule for determining whether a charterer is to be treated as the owner of the ship during the life of the charter party are recognized and applied in nearly all of the decisions cited upon the argument of this case. See Marcardier v. Insurance Co., 8 Cranch, 39, 3 L. Ed. 481; The Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756; Shaw v. U. S., 93 U. S. 235, 23 L. Ed. 880; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; Donahoe v. Kettell, Fed. Cas. No. 3,980; The Aberfoyle, Fed. Cas. No. 16; Certain Logs of Mahogany, Fed. Cas. No. 2,559; Drinkwater v. The Spartan, Fed. Cas. No. 4,085; Eames v. Cavaroc, Fed. Cas. No.

4,238; Hill v. The Golden Gate, Fed. Cas. No. 6,492; Mott v. Ruckman, Fed. Cas. No. 9,881; Richardson v. Winsor, Fed. Cas. No. 11,795; Webb v. Peirce, Fed. Cas. No. 17,320; Winter v. Simonton, Fed. Cas. No. 17,894; The Volunteer, Fed. Cas. No. 16,-991; Posey v. Scoville (C. C.) 10 Fed. 140; The T. A. Goddard (D. C.) 12 Fed. 174; Anderson v. The Ashebrooke (C. C.) 44 Fed. 124; The Euripides (D. C.) 52 Fed. 161; Steamship Co. v. Washington, 6 C. C. A. 313, 57 Fed. 224; The Alvira (D. C.) 63 Fed. 144; The Nicaragua (D. C.) 71 Fed. 723; Id., 18 C. C. A. 511, 72 Fed. 207; The Terrier (D. C.) 73 Fed. 265; Bramble v. Culmer, 24 C. C. A. 182, 78 Fed. 497; The Elton, 31 C. C. A. 496, 83 Fed. 519; Mc-Gough v. Ropner (D. C.) 87 Fed. 534; American Steel-Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964; Dest. Shipp. & Adm. § 205; 7 Am. & Eng. Enc. Law (2d Ed.) 164–194. In some of these cases it was decided, in accordance with the rule stated, that the charterer was owner pro hac vice, and in others the charterer was found to be not such owner. I have not separated one class from the other, because it would be useless to do so, since both give equal support to the general rule. The only apparent departure from the rule which casts upon the charterer who receives possession of the ship and has full control of her operations the responsibility of ownership and liability for the conduct of the captain and crew, which has been brought to my notice, is the case of The Craigallion (D. C.) 20 Fed. 747. I am not disposed to criticise that decision, as the facts upon which it was based appear to have been peculiar. It is enough to say that one decision by a district court sustaining a suit in rem against a chartered vessel by the charterer for damages to the cargo, caused by the negligence of the officers and mariners in the performance of their ordinary duties, as such, while the vessel was in the possession and control of the charterer, is not sufficient to outweigh the great weight of authority, which, in my judgment, establishes a fixed rule of law inconsistent with any right in an owner pro hac vice to hold the ship or her general owner liable to him for losses attributable to torts or crimes of the master or crew. The Daniel Burns (D. C.) 52 Fed. 159. And the charterer is owner pro hac vice where the master is subject to his orders and directions, though appointed to his position as master by the general owner. The India (D. C.) 14 Fed. 476; The Bombay (D. C.) 38 Fed. 512. In such a case the charterer is himself responsible for the torts of the master, because, having a legal right to control, he is legally presumed to actually control, the master's conduct. On the other hand, the general owner is not responsible, because he does not have the right to control the master in the performance of his duties. Wood, Mast. & S. § 281.

Having in view the law applicable to this case as settled by the above authorities, it is not a difficult matter to ascertain which of the parties to the cause now before the court should be held responsible for the conduct of the captain and steward of the Del Norte as to the several matters alleged in the libel. The charter party is set forth in the pleadings of both parties, and there is no controversy as to its exact terms. The contract is in writing, and the

parties to it are the Crescent City Transportation Company, which will hereafter be referred to as the "owner," and T. F. Townsley, heretofore and hereafter referred to as the "charterer." The first article provides: That the owner, for and in consideration of the covenants and agreements of the charterer to be kept and performed, does hereby charter, let, and hire to the charterer the whole of the steamship Del Norte, her tackle, apparel, furniture, machinery, appurtenances, and appliances, for the term commencing on the 6th day of June, 1898, and extending to and including the 6th day of October, 1898; said vessel to be employed during the term of this charter party in plying between the port of Seattle, Wash., and ports, islands, and places in Alaska. The second article provides that the vessel shall be delivered to the charterer at Seattle in good order and repair. The third article provides that the owner shall protect the vessel from all liens and claims of liens on account of debts contracted prior to the date specified for her delivery to the charterer. The fourth article specifies the rent to be paid by the charterer, and the dates, places, and manner of payments, and provides that in case of nonpayment the owner may retake possession of the vessel, and provides for the forfeiture of a specified sum to the owner as damages. The seventh article provides that the charterer shall deliver to the owner at the termination of the charter party the vessel, her tackle, apparel, furniture, machinery, and appurtenances, subject to exceptions, specified in the sixth article, of reasonable wear and tear and damages arising from collisions, stranding, fire, perils of the sea, and inevitable casualties. The eighth article provides that the charterer shall have full charge of the vessel during the continuance of the charter party, and shall pay all bills and expenses incurred in the operation of the vessel, including wages of the master, officers, and crew, except as provided in the sixth article, and that all earnings of the vessel, of whatever description, during the term specified, shall belong to the charterer, and inure to his sole benefit; and that, before the vessel shall be permitted to leave the port of Seattle during the continuance of the charter party, all debts contracted by the charterer for stores, supplies, or any other matter or thing whatever purchased for the use or operation of the ship, shall be fully paid, and payment certified by the master and steward; and provides that the charterer shall deposit a specified sum of money to secure payment of wages of the master and crew. The ninth article provides that the owner shall have the naming and appointing of the master, chief engineer, and steward of the vessel, said officers to be in all respects under the orders and direction of the charterer, and to receive from him wages at a rate specified; and provides further that, in case the charterer shall be dissatisfied with the conduct of either of said officers, the owner, on receiving written notice of his dissatisfaction, and the particulars and reasons therefor, shall remove the offending officer (if, upon investigation, such complaint shall be found to be justified), and shall appoint another in place of the officer so removed. The tenth article provides that the charterer shall not expose the vessel to

liability, to forfeiture, or fine under the laws of the United States by carrying contraband merchandise, or by any violation of the revenue or shipping laws of the United States. The eleventh article provides that the charterer shall pay the sums agreed upon, not assign the charter party nor sublet the vessel without the written consent of the owner, and shall deliver the vessel at the port of Seattle at the expiration of the term specified in the charter party, and that in case of his failure, neglect, or refusal to pay for the use of the vessel at the times and in the manner agreed upon, or any part thereof, or to pay the bills and expenses of operation of the vessel, including wages, the owner shall have the right to consider the charter party forfeited, and retake possession of the vessel, wherever she may be; and that in such case it shall be the duty of the master, at the request of the owner, its agent or attorney, to hold possession of the vessel for and as the representative of the owner, but forfeiture of the charter party for the causes specified shall not release the charterer or any security given by him from the payment of any portion of the rent agreed to be paid, or from the payment of the bills or expenses contracted in the operation of the vessel; and further provides that the charterer shall protect the vessel from being libeled for any matter or thing occurring subsequently to his receiving possession thereof by virtue of this charter party. The twelfth article provides that the Del Norte may tow barges or other vessels from Puget Sound to islands and places in Alaska, but the master shall have the right to determine the number of barges or vessels to be towed and the amount of cargo to be carried by each, and shall have the right to abandon any tow, when, in his judgment, the safety of the Del Norte requires. No liability shall attach to the owner by reason of any such abandonment, but it is agreed that the master is expected to use due diligence for the protection of any tow placed in his charge. A supplemental agreement annexed to the charter party also provides that the Del Norte may be employed to carry freight or live stock and passengers between Alaska and Siberia, but not to land freight or passengers at any place where the ship would be in danger, the master to judge of the safety of all landing places; and as part of the consideration for this privilege it was agreed that the master should collect the earnings in this trade, and that, if necessary, he might apply the same to pay operating expenses, and the rent to accrue under the charter party.

There is certainly very little, if any, ground for claiming that this instrument is ambiguous, or that its meaning is doubtful with respect to its being a demise of the ship. The different provisions are harmonious with the manifest purpose to place the ship, during the term for which she was hired, in the possession of the charterer, and to give him complete control of the entire ship, and her employment, and also complete control of her officers and crew. His right to have such complete possession and control could only be forfeited by failure on his part to make the required payments, or by a breach of his covenants to not expose the vessel to forfeiture by any infraction of the laws, or by failure to keep the ves-

sel free from liens. The charterer not only had a right of possession under the contract, but it is a fact admitted by the pleadings that the vessel was actually delivered, and that he did have possession during the time covered by the alleged peculations and wrongful conduct of the captain and steward. The charterer's covenants contained in the charter party obligating him to protect the vessel from seizure, and to secure her release promptly in case of an actual seizure being made, are sufficient to cast upon him the financial liabilities incident to ownership of a vessel engaged in commerce, and are entirely inconsistent with any right of the charterer to subject the ship to liability by a proceeding in rem on account of any malfeasance or wrongful act of her officers while in his service. A lien is essential to the foundation of a suit in rem in admiralty, and, as a man cannot acquire a lien upon his own property, the libelant's ownership of the vessel is a complete bar to a suit against her in rem, and the legal effect is the same whether the ownership be temporary only, or permanent.

On the rehearing it has been argued very earnestly that the twelfth article of the charter party vests in the master authority superior to the right of the charterer to control the operations of the vessel in towing barges, and that, as the owner is expressly exempted from liability for abandonment of any tow when, in the judgment of the master, the safety of the vessel requires such abandonment, this article should be construed differently from other parts of the contract, and that for the loss of a barge, alleged to have resulted from abandonment thereof in a safe harbor, when there was no imminent peril to the ship, there is an implied agreement that the owner should be liable. I might assent to this argument if in fact the twelfth article did confer upon the master any unusual or extraordinary power; but it does not. Under the law the master of a ship is responsible for the proper stowage of cargo. It is part of his duty to see that his vessel does not proceed upon a voyage overburdened, and he has authority superior to that of the charterer or owner to abandon a tow or jettison cargo to save his ship when in peril, and it is also his duty to be diligent to protect property intrusted to his care, whether it be a barge in tow or merchandise in the hold. Stipulations in the contract agreeing that the master shall have such powers, and that he shall be obligated to perform such duties, have no more effect to enlarge the rights of the charterer than would an agreement that the master shall maintain discipline on the ship, and supervise the work of his subordinates and the crew, and see that the steward does not waste the stores provided for a voyage. The contract in its entirety must be construed as an agreement that the master to be chosen by the owner should have all the powers pertaining to the office of master, and that in the operations of the ship he should be subject to the control of the charterer only to the same extent that an owner usually exercises his power to control. In my opinion, the twelfth article adds nothing to the contract except the right of the charterer to have such increased profits as might be earned by performing towing services. The only addi-

tion to the master's authority conferred by the supplemental agreement was the sole right to collect the earnings of the ship in the Siberian trade, and use the same, if necessary, to meet the charterers' obligation to pay expenses and the rent stipulated for. This agreement is not incompatible with the master's position as agent of the charterer, and it does not override the provisions of the charter party, which constituted him such agent, nor change the relation of the charterer towards the ship as owner pro hac vice. All the earnings of the ship during the life of the contract which the master collected belonged to the charterer, and the master was not authorized to appropriate any of it otherwise than to pay it out in discharging the charterers' liabilities. For any surplus he is accountable, and the owner is not accountable to the charterer unless it received the money.

For the reasons I have stated, all of the damages claimed by the libelant on account of the alleged misconduct of the captain and steward must be eliminated, and further inquiry with respect to the damages demanded by the libelant must be confined to the claim which he makes on account of being dispossessed before expiration of the time for which the vessel was hired. A forfeiture of the charter party was claimed, and the owner, by his agents and representatives, took the vessel out of the libelant's possession on the 10th day of September, 1898, which was 27 days before the expiration of the term specified in the charter party. The only ground for this proceeding is an alleged default on the part of the charterer by nonpayment of the full amount of rent which became due and payable on the 1st day of September. If, in fact, all the payments made by the charterer and the earnings of the vessel received by the captain and turned over to the owner were insufficient to pay all the wages earned and other expenses of operating the vessel and the full amount of rent to the end of the term, the owner had a right to take possession of the vessel at any time after September 1st, and the charterer is precluded from claiming damages on account of being dispossessed. It appears by a voucher introduced in evidence as "Exhibit E" that cash payments were made to John W. Graham, the agent of the owner, who conducted the negotiations for the charter and signed the charter party as agent for the owner, and money was deposited, as required by the charter party, to the amount of $10,650, and said agent also received in lieu of cash an order for $600. The statement of account rendered to the charterer by an agent of the owner, after the vessel returned from her northern voyage, which was produced in evidence, and marked "Libelant's Exhibit A," shows that the earnings for the voyage and money paid by the charterer to the captain amounted to the total sum of $5,408.88. Presumably this money, less the amount which the captain claimed to have disbursed in Alaska, was turned over by the captain to the owner, otherwise the owner would not have accounted for it to the charterer,—making an aggregate amount of cash credits in favor of the charterer on account of the charter party of $16,658.88. Against this total the charterer is to be debited with the rent for

the whole term,—that is, up to October 6th,—which amounts to $12,300, and expenditures made by the captain during the voyage, and the wages up to September 10th. From the evidence I find the following to be the true amounts: Wages to September 3d, $4,316.80; expenditures during the voyage, $2,705.65; wages from September 3d to September 10th, $173.16. The libelant is also chargeable with $1,250 for extra insurance premiums under the supplemental agreement. I disallow the claim for board of the officers and crew after the return of the vessel to Seattle, for the reason that the surplus stores which the libelant provided have not been accounted for. The total amount of all debits against the libelant is $20,745.61. The evidence sustains the libelant's claim for $300 on account of stores, fuel, and supplies for the engine room, which he paid for, and which remained on board the vessel when he was dispossessed. I allow him credit for that sum in addition to the benefit of the disallowance of the claim made against him for board. Upon a complete adjustment of the whole account, there is a balance due to the cross libelant of $3,786.73, and interest thereon at the rate of 7 per cent. per annum from September 10, 1898.

The owner's agent in Seattle demanded a sum very much in excess of the true balance due, and the libelant now claims that he was greatly prejudiced by this exorbitant demand, and was thereby prevented from securing money sufficient to meet the payment necessary to have entitled him to retain the vessel to the end of the term, and on that ground he urges that he should be relieved from his obligation to pay rent and wages for the time after September 3d, but, having failed to make a legal tender of the sum which was due, there is no legal ground upon which the court can grant relief.

A decree will be entered in favor of the cross libelant for the amount of said balance and interest and costs.