## AMERICAN STEEL-BARGE CO. v. CARGO OF COAL ex THE CITY OF EVERETT.

(District Court, D. Massachusetts. March 28, 1901.)

### No. 986.

1. SHIPPING—CONSTRUCTION OF CHARTER—GENERAL RULES.

A charter party, which is often an informal instrument, must be given a liberal construction, such as mercantile contracts usually receive, in furtherance of the real intention of the parties; and all of its provisions must be taken into consideration in determining the meaning of any particular clause, or the scope and effect of the charter as a whole.

2. SAME—TIME CHARTER—DEMISE OF SHIP FOR TERM.

By a time charter the owner agreed to let, and the charterer to hire, a steamship for the term of one year, the hire to be paid monthly in advance. It provided for a "delivery" of the ship to the charterer, and a redelivery at the end of the term. The charterer was to pay the wages of the crew and for provisions, stores, supplies, and other charges except insurance, and to keep the vessel in repair, and paint it once during the term. It was given the right to employ the vessel in any kind of lawful coasting trade between certain designated ports on the Atlantic coast, and to purchase it at any time at a fixed price. The captain was to be appointed by the owner, but to be under the orders and direction of the charterer, which agreed to indemnify the owner for the acts of the captain in signing bills of lading or otherwise in complying with its orders. The whole accommodations of the ship were to be at the disposal of the charterer, reserving proper space for the crew,

tackle, stores, etc. The charter further provided that the owner should have a lien upon "all cargoes and all subfreight" for charter money due thereunder. *Held,* that such charter, construing all its provisions together, constituted a demise of the ship, which put the charterer in' possession and control as owner for the voyages made thereunder. ·

3. MARITIME LIENS—CHARTER PROVISIONS—LIEN OF OWNER ON CARGO FOR CHARTER MONEY.

A provision in a time charter, which leased the ship for the term, and made the charterer owner for the voyages made thereunder, reserving to the owner "a lien upon all cargoes and all subfreight for charter money due under this charter," cannot be construed to give the owner a lien upon cargo owned by third persons, and shipped under contract with the charterer, for charter money due; nor has he any lien on such cargo, under either the charter or the maritime law, to compel the shipper to pay the freight to him, such lien being created by the maritime law in favor of the person in possession of the ship. The only effect of such provision purporting to give the owner a lien upon cargo is to bind such cargo as is owned by the charterer to the extent of the charter money due.

In Admiralty. Libel of cargo under claim of lien for charter money due libelant from the carrier as charterer.

Frederic Dodge and Edw. S. Dodge, for libelant.
J. B. & H. E. Warner, for respondent.

LOWELL, District Judge. The libelant in this case, being the owner of the steamer City of Everett, chartered it to the Atlantic Transportation Company by a charter of which the material parts are as follows:

"Witnesseth that the said owners agree to let and the said charterers agree to hire said steamship for the term of one year from the 5th day of April, 1898, she being then placed at the disposal of the charterers at New York, at such dock or at such wharf or place (where she may always safely lie afloat) as charterers may direct, she being then tight, staunch, strong, and every way fitted for the service (and with full complement of officers and engineers for a vessel of her tonnage); to be employed in such lawful trades on the Atlantic coast of the United States, between ports not south of Hatteras or east of Portland, Maine, as charterers or their agents shall direct,—on the following conditions: That the owners shall provide and pay for all insurance on said steamship. That the charterers shall provide and pay for all provisions and wages of the captain, engineers, firemen, and crew; shall pay for all engine-room stores, fuel, deck supplies, chandlery, hawsers, and all other supplies, port and other charges whatsoever, except the insurance, and maintain her in a thoroughly efficient state in hull and machinery for the service; and shall also once during the life of this charter, at their own expense, dock and paint said steamship: provided she remains under charter for the full year. That the charterers shall pay for the use and hire of the said vessel at the rate of twenty-eight hundred twelve and 50/100 dollars ($2,812.50) per month, commencing on the day of delivery of said steamship to the charterers in the port of New York, and at and after the same rate for any part of a month; hire to continue from the time specified for terminating this charter until her delivery to owners (unless lost) at the port of New York. Payment to be made in cash, monthly in advance, at the office of the owners, 36 Wall street, New York City; and in default of such payment or payments as herein specified the owners shall have the faculty of withdrawing said steamer from the service of the charterers, without prejudice to any claim they, the owners, may otherwise have on the charterers in pursuance of this charter. That the cargo or cargoes shall be laden and/or discharged in any dock or at any wharf or place that charterers may direct, where she can always safely lie afloat. That the whole reach, burthen, and

accommodations of the ship (not more than she can reasonably stow and carry) shall be at charterer's disposal, reserving proper and sufficient space for the ship's officers, crew, tackle, apparel, furniture, provisions, and stores. That during the life of this charter, or until the charterers may exercise the option herein given, the captain shall be an appointee of the owners, but shall be under the orders and direction of the charterers; and the charterers hereby agree to indemnify the owners from all consequences and liabilities that may arise from the captain signing bills of lading or in otherwise complying with the same. That, if the charterers shall have reason to be dissatisfied with the conduct of the captain, the owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change. That the charterers shall have the option at any time during the life of this charter of purchasing said steamer at a price of two hundred and twenty-five thousand dollars ($225,000). That the owners shall have the option at any time after six months from the beginning of this charter, and in case they have a bona fide purchaser, of canceling this charter upon giving to the charterers thirty days' written notice. In case, however, said notice is given to the charterers, said charterers shall have the right to immediately elect to purchase said steamer at the price agreed upon with said bona fide purchaser. That, should the vessel be lost, any hire money paid in advance, and not earned (reckoning from the date of her loss), shall be returned to charterers; the act of God, enemies, fire, restraints of princes, rulers, and people, and all other dangers and accidents of the sea, rivers, and navigation throughout this charter party always excepted. That, should any dispute arise between the owners and the charterers, the matter in dispute shall be referred to three persons in New York; one to be appointed by each of the parties hereto, and the third by the two so chosen. Their decision, or any two of them, shall be final. And for the purpose of enforcing any award this agreement may be made a rule of court; said arbitration to be submitted within ten days after written notice of complaint. That the owners shall have a lien upon all cargoes and all subfreight for charter money due under this charter; and the charterers to have a lien on the ship for all moneys paid in advance, and not earned. That the charterers shall deliver said steamship to owners in like good order and condition, ordinary wear and tear excepted, in the port of New York, at the expiration of service provided by this charter."

The payments due under this charter party were made regularly through November 5, 1898. The monthly advance payment due December 5th was not made, nor was any payment made after that date. On December 30, 1898, the City of Everett left Newport News with a cargo of coal belonging to the claimant consigned to the claimant's agent in Boston. The bill of lading was in the usual form, signed by the master. The freight payable was stated to be "as agreed." There was a standing agreement between the charterer and the claimant to transport coal from Newport News to Boston at 70 cents per ton, and under this agreement the charterer had carried for the claimant a large amount of coal in many vessels, of which the City of Everett was one. The freight, as fixed by this contract, less certain sums, which are not in dispute, was $2,348.46. On December 30th the claimant paid to the charterer in New York, at the charterer's request, the sum of $1,500 on account of the freight to be earned by the City of Everett, and took from the charterer a receipt for the amount. The payment was not, and could not have been, indorsed on the bill of lading. The claimant then was, and had been for some time, indebted to the charterer for coal to an amount largely exceeding the freight on the cargo in question. Upon the arrival of the steamer in Boston, the libelant libeled the coal, and now seeks to hold it for the total amount of freight due thereon at the rate of 70 cents per ton.

He asserts a lien upon the coal for freight, as the owner of a vessel which has earned freight in the carrying of cargo.

The court has first to consider if, for this purpose, the libelant or the charterer is to be treated as the owner of the steamer for the voyage. It was observed by Judge Ware, in Drinkwater v. The Spartan, Fed. Cas. No. 4,085, that:

"There are, however, two kinds of contracts passing under the general name of 'charter party,' differing from each other very widely in their nature, their provisions, and in their legal effect. In one, the owner lets the use of his ship to freight, he himself retaining the legal possession, and being liable to all the responsibilities of owner. The master is his agent, and the mariners are in his employment, and he is answerable for their conduct. The charterer obtains no right of control over the vessel, but the owner is in fact and in contemplation of law the carrier of whatever goods are conveyed in his ship. The charter party is a mere covenant for the transportation of merchandise or the performance of the service which is stipulated in it. In the other the vessel is herself let to hire, and the charterer takes her into his own possession. It is a contract for a lease of the vessel. The owner parts with possession and the right of possession, and the hirer has not only the use, but the entire control, of the vessel herself. He becomes the owner during the term of the contract. He appoints the master and mariners, and is responsible for their acts. If goods are taken on freight, the freight is due to him; and if, by the barratry or other misconduct of the master or crew, the shippers suffer a loss, he must answer for it. If he ships his own goods, he is his own carrier. Under a charter party of the former description the charterer may hire the use of the whole vessel, and it may be employed in carrying his own goods or the goods of other merchants on freight. His own goods become liable to the owner of the vessel for the charter to the full extent of their value, and, though he is entitled to the freight of the goods shipped by the subfreighters, the owner of the ship has a lien on that freight for the charter of the vessel; and his lien extends to the goods of each subfreighter for the amount of freight due on his shipment."

See, to the same effect, Reed v. U. S., 11 Wall. 591, 600, 20 L. Ed. 220.

In Abb. Merch. Shipp. (13th Ed.) p. 57, the classification is practically the same, Abbott's third class covering contracts of affreightment simply, which are not dealt with at all in Judge Ware's classification.

The court has to determine to which of the two classes thus clearly defined the charter in question belongs. As was said in Raymond v. Tyson, 17 How. 53, 59, 15 L. Ed. 47, 49:

"It must be remembered that a charter party is an informal instrument as often as otherwise, having inaccurate clauses, and that on this account they must have a liberal construction, such as mercantile contracts usually receive, in furtherance of the real intention of the parties and usage of trade. So Lord Mansfield said a long time since."

So, in Belcher v. Capper, 11 Law J. C. P. 274, Chief Justice Tindal said of charter parties:

"In each case the whole contract must be taken together, and due effect given to the several clauses which counteract or qualify each other: and thus it often happens that the same expressions will bear different meanings, and require a different interpretation, according to the context of the instruments in which they are found."

It is not surprising, therefore, that this charter, like many others, contains phrases, some of which, taken separately, point to one construction, and some to another. In support of the claimant's conten-

:tion that the charterer was owner for the voyage, the following are the most important:

(1) The words used to describe the letting: The "owners agree to let and the said charterers agree to hire said steamship." These phrases are appropriate to the demise of the vessel. They are not conclusive, but have considerable weight. The vessel is also placed at the disposal of the charterer. There is to be a "delivery of said steamship" to the charterer, and at the end of the term the charterer is to "deliver said steamship" to the owner.

(2) The provision that the charterers shall pay for provisions, wages, stores, supplies, and other charges except insurance. This provision again, taken by itself, is not conclusive, but is important, and in its full extent is seldom, if ever, found in charters by which the owner retains possession of the vessel.

(3) The charterer agrees to keep the vessel in repair, and once during the term of the charter to dock and paint her at its own expense. This again is a duty undertaken by the owner in nearly all cases in which he retains possession of the vessel.

(4) The charterer has the right to employ the vessel in any kind of lawful coasting trade between Portland and Hatteras.

(5) The charterer has the right at any time during the charter to buy the vessel at a fixed price, and, although the owner may sell the vessel on 30 days' notice if it finds a bona fide purchaser thereof, yet even in that case the charterer has a prior right to take the vessel at the price agreed upon with the bona fide purchaser.

(6) The captain, though the appointee of the owner, is to be under the orders and direction of the charterer, and the charterer agrees to indemnify the owner for the acts of the captain in signing the bills of lading, or otherwise in complying with the charterer's orders. This provision will be discussed later.

If there were nothing to the contrary, the provisions just mentioned would plainly make the charterer the owner of the vessel pro hac vice, so that the cargo carried would be in his possession, and he alone would have a lien thereon for the freight. There are, however, other clauses in the charter which support the libelant's contention that the owner retained possession:

(1) The captain was to be appointed by the owner. Who was to appoint the other officers and the crew does not clearly appear, but the charter states that at the time the charter was made the vessel had a full complement of officers and engineers. Probably the appointment of any one but the captain was not distinctly in the minds of the parties. The old officers were retained, and, when vacancies occurred, these seem to have been filled by common consent, and without discussion. This was done both in the employment of Deboll as substitute captain and in obtaining an engineer. Doubtless, the appointment of the master by the owner has been deemed in many cases a very important consideration in determining whether the owner or the charterer has possession of the vessel, but it has not always been deemed conclusive. Master, etc., of Trinity House v. Clark, 4 Maule & S. 288. In Sandeman v. Scurr, L. R. 2 Q. B. 86, 96, Lord Chief Justice Cockburn speaks of "a demise of the ship itself, to which the serv-

ices of the master and crew may or may not be superadded." In that case, he goes on to say, "the charterer becomes for the time the owner of the vessel, the master and crew become to all intents and purposes his servants, and through them the possession of the ship is in him." In his work on Charter Parties (page 22) Mr. Leggett says that this, "although a possible form of contract, seems, as a matter of business, to have no existence at the present day." With all respect for the learned author, it may be suggested that an opinion of Sir Alexander Cockburn, rendered in 1866, is not yet obsolete. A charter like that here under consideration, having for its object to increase the fleet of vessels controlled by the charterer, and largely owned by him,—an object not unusual, at least in America,—may illustrate the chief justice's statement above quoted. Whatever importance be allowed to the appointment of the master, yet in no case, it is believed, has the owner been deemed in possession when other circumstances have made so strongly as here for the possession of the charterer. In the Nicaragua (D. C.) 71 Fed. 723, same case on appeal, 18 C. C. A. 511, 72 Fed. 207,—which appears to me the strongest case in support of the libelant's contention,—the charter provided "that the captain, although appointed by owners, shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with their orders and directions." This clause certainly resembles closely the clause in the charter now under discussion, though it is to be observed that, taken with the rest of the charter, it puts the captain under the orders and direction of the charterers as to "employment, agency, or other arrangements" only; thus by implication excluding the charterers from the complete control of the master here given by the clause which places him under the charterer's orders without qualification. But in The Nicaragua the owners were to pay for provisions, wages, supplies, and fees, were to keep the vessel in good repair, and to feed the passengers at a fixed price, to be paid by the charterers. The cargo was to be laden and discharged under the master's direction, the charterers not being responsible for improper stowage. It was stipulated that the captain should prosecute his voyage with dispatch, thus implying that this dispatch was to be procured by the owners, and that the control of the charterers over his actions was not complete. The charterers were given permission to appoint a supercargo,—a permission quite unnecessary if the vessel was in their control; and payment of hire was to cease if the vessel broke down from causes appertaining to the duties of the owner. These provisions have been stated thus fully because the Nicaragua's charter provided for the appointment and control of the master in language resembling that of the charter under consideration more closely than any other charter by which the owner has been held to retain possession of the vessel. Other cases which have construed charters to leave the vessel in its owner's control could be distinguished at length from the case at bar as The Nicaragua has been distinguished, but to do this would unduly lengthen the opinion; and, if The Nicaragua is fairly distinguishable,

it is believed that no other case supports the libelant's contention. In the case at bar the provision for the appointment of a master by the owner is immediately qualified by the statement that he is to be completely under the control of the charterer. In The Beeswing, 5 Asp. 484, the master was to be appointed by the charterers, and to follow their instructions, they furnishing him "with the necessary sailing directions." Yet because the vessel was otherwise left in the hands of the owners, because the captain was to be paid by them, and for other reasons, there was held to be no demise of the ship. In many respects the case at bar is the converse of The Beeswing. In The New York (D. C.) 93 Fed. 495, the charterer was held to be in possession of the vessel, although the owner kept and paid a man on board of her for a general oversight of her condition. The provision for the master's appointment is here construed not to keep the vessel in the libelant's control, but merely to insure for his benefit that the master shall be a suitable person approved by him.

(2) The second clause relied upon by the libelant is the exclusion from the charterer's disposal of proper and sufficient space for the ship's officers, crew, tackle, etc. This is not an important provision. Practically, the ship could not be run to the advantage of the charterer if the officers and crew had not where to lay their heads, or if the tackle and stores were crowded out by the cargo. The provision is one of great age (see Thornton v. Bethel, Lutw. 704), and was inserted from earlier charters without much thought of its meaning or application here. Doubtless some weight is attached to it in The Volunteer, Fed. Cas. No. 16,991, and in some other cases, but only as to one among many considerations. I do not believe that either owner or charterer, in the case at bar, gave it a thought. See Belcher v. Capper, 11 Law J. C. P. 274, where the clause is found in a charter party which was held to put the charterer in possession of the vessel.

(3) The libelant relies especially upon the clause giving to it "a lien upon all cargoes and all subfreight for charter money due under this charter." Standing in the charter under consideration, these words, it must be confessed, are not altogether easy to interpret. Taken literally, they give to the libelant a lien upon any part of the cargo for all the money due to it under the charter,—a construction so unjust as to be manifestly impossible. Doubtless this clause is the successor of that penal clause by which the charterer bound his "executors and administrators and the goods intended to be laden." Thornton v. Bethel, Lutw. 704, 707. See Perkins v. Hill, Fed. Cas. No. 10,986. The clause is a common one, as the cases abundantly show. It is found in charters where the owner has parted with the control of the vessel. Meiklereid v. West, 1 Q. B. Div. 428, 431. In Baumwoll Manufactur v. Furness [1893] App. Cas. 8, 16, Lord Herschell called it "a provision as between charterer and ship." In Perkins v. Hill, Fed. Cas. No. 10,987, Mr. Justice Woodbury said, "It is very questionable whether the cargo belonging to third persons is ever held by that customary clause in the charter party, but merely the cargo belonging to the charterer." In truth, the clause was framed when a charterer intended ordinarily to

freight the ship with his own property. That this was usually the case with charters in the past may be seen from examining the earlier cases dealing with charter parties. That the charterer was the owner of the goods shipped, though often assumed, rather than insisted upon in argument, explains not a few opinions which would otherwise be confusing. By this clause the charterer binds his own goods shipped on the chartered vessel, not for the freight due on those goods, but for the amount due under the charter, be that amount more or less than the freight. Small v. Moates, 9 Bing. 574. In the case at bar the clause appears to me a survival, and not intended to defeat the other provisions of the charter which give to the charterer the control and possession of the vessel. Can it be supposed that in paying freight for merchandise carried in the charterer's fleet shippers were intended to distinguish between one vessel and another of that fleet; to pay some freight directly to the Atlantic Transportation Company, and, before paying other freight, to communicate now with one owner and now with another? Here the freight might have been paid to the captain, it is true, but neither the captain nor any one else expected this to be done. In these days the captain is no longer a stranger in a strange land, necessarily left to shift for himself, and to manage the vessel's affairs. He is an agent who can communicate with his principal at a few minutes' notice. Direct dealing with those who operate vessels is thus much more common than formerly.

It must be admitted that most of the cases in this country, while recognizing distinctly the two classes of charters defined by Judge Ware, yet have held that the charters which the courts had under consideration belonged to the first class. That this was the case in the vast majority of the charters made a generation ago, I do not doubt. The earlier charters were ordinarily made of a single vessel to a man proposing to employ that vessel alone. This charter, as the libelant knew, was made to a company owning some vessels and operating others under charter from various individuals. The charter whereby a company owning many vessels and operating them increases the fleet in its possession and under its control by the hire of vessels from other owners is of comparatively modern origin, but that seems to me the transaction contemplated here. This charter, therefore, is held to have put the City of Everett into the possession and under the control of the charterer.

It was urged that, whether the libelant or the charterer were for most purposes the owner of the vessel for the voyage, yet the clause in the charter concerning freight affected the cargo with a lien, where that cargo was shipped by one who had knowledge of the existence of the charter. That the clause was originally intended to bind the whole cargo shipped for the whole charter rent, on the theory that the cargo was the charterer's property, has been shown already. This is what the clause says: No lien on the cargo for the freight due thereon is created, but only a lien "for charter money due under this charter." To construe this language as creating a lien on the cargo for the freight due thereon up to the amount of the charter money due under the charter is to make a new contract

for the parties into which they never entered. The lien on sub-freight given by the charter does not help the libelant, which here seeks to enforce not a lien on freight, but a lien for freight. That a knowledge of the existence of the charter party does not bind the property of shippers other than the charterers for the rent due under the charter party, has been decided (Paul v. Birch, 2 Atk. 621; The Volunteer, 1 Sumn. 551, 573, Fed. Cas. No. 16,991; The Albert Dumois [D. C.] 54 Fed. 529); and this even where the bill of lading refers expressly to the charter (Fry v. Bank, L. R. 1 C. P. 689). If a knowledge of the charter's existence and a reference to it in the bill of lading do not bind the property of an outside shipper to full compliance with the terms of the clause, I can see no reason why they should bind the same property to any less extent. A lien upon a cargo for its freight is created by the maritime law in favor of the person in possession of the ship. A lien upon cargo for the charter rent is created by the charter in favor of the general owner of the vessel. That the libelant, as not in possession of the vessel, cannot avail itself of the first lien has been stated already. That it cannot avail itself of the second lien, its counsel concedes. The hybrid lien just suggested, created neither by maritime law nor by express contract, is without warrant. The clause in question binds only the charterer's property, and binds that to the full extent of the charterer's liabilities under the charter party. Upon other property the owner's lien for freight stands as it would stand in the absence of the clause, except that, where the owner has retained control of the vessel, the clause may be evidence that he has not abandoned his ordinary lien for freight.

The same result is reached if the intent of the charter be sought, apart from all technical considerations. The object of the charter was to give the charterer the right to use the vessel for certain purposes, broadly limited. For the vessel's use the charterer was to pay a certain sum of money. Having paid it, and within the limits prescribed, the charterer was free to make as much money as possible, and both parties manifestly contemplated that this money was to be made by carrying goods of third parties. To suppose that these third parties were to pay freight to the owner rather than to the charterer, or were to communicate with the owner before paying the charterer, is to suppose that the charter contemplated tying the charterer's hands so as to render its use of the vessel almost worthless. This was not the charter of a vessel for one voyage, whether varied by calling at intermediate ports or not. It was the charter of a vessel to make several trips a month, more or less regular. Can it be supposed that the owner of a steamer running daily under a charter like this to replace a disabled vessel on the Fall River Line would have a lien on its cargo for freight? Must a shipper in that case or in this observe carefully by which vessel his goods are transported, in some cases paying by advance or by set-off, in other cases communicating with the true owner before trying to get his goods? Even if, in the beginning, the shipper in this case could have reasonably supposed itself called upon to pay the freight to the captain, yet the fact that many times, and for months, it had paid directly

to the charterer, without suggestion of opposition from any one, would naturally lead it to suppose that all parties intended it to deal directly with the charterer. Under most charters, again, charter money and freight are payable at substantially the same time, while here the two payments have no temporal relation. If the charterer was able to collect the freight at the end of the voyage, I can see no reason why it might not receive payment in advance in whole or in part. The owner may have intended to preserve a lien upon the freight due (although not upon the cargo) against ordinary creditors of the charterer. If it was material for the shipper to discover whether the vessel belonged to the charterer or not, very possibly the shipper in this case was put upon inquiry; but the shipper dealt with the charterer as charterer, or rather with the charterer as it was entitled to deal with one who had control of the vessel, whether owner or charterer. Even if the claimant had read the terms of the charter, and even if it had considered itself bound by the clause above referred to, it may be questioned if it was bound to suppose that rent under a charter payable in advance had been left uncollected by the owner. Advance rent was due December 5th. If it was not paid then, the owner had the right to withdraw the vessel. It was the owner's failure to insist upon this right that caused it to lose its December rent. Libel dismissed.