FILED

OCT 29 2013

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. WW-12-1083-DTaKu |
| | ) | |
| DOUGLAS HUNTINGTON, | ) | Bk. No.  10-48947-BDL |
| | ) | |
| Debtor. | ) | Adv. Proc. No. 11-4015-BDL |
| _____ | ) | |
| | ) | |
| LAURA HUNTINGTON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| DOUGLAS HUNTINGTON; | ) | |
| VIKING COMMUNITY BANK, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on October 17, 2013
at Seattle, Washington

Filed - October 29, 2013

Appeal from the United States Bankruptcy Court
for the Western District of Washington

Honorable Brian D. Lynch, Bankruptcy Judge, Presiding

Appearances:    Robert A. Beattey of Spencer Law Firm, LLC argued for appellant Laura Huntington; Gary Krohn argued for appellee Viking Community Bank.

Before:  DUNN, TAYLOR and KURTZ, Bankruptcy Judges.

---

[1]    This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

Through what only can be described as novel theories based on faulty premises, the spouse of a chapter 7[2] debtor invoked the jurisdiction of the bankruptcy court in attempts (1) to subordinate the lien of the holder of the second deed of trust on community property that was her residence to the subsequent lien filed by the Internal Revenue Service ("IRS"), and (2) to seek an award of damages against the second lien creditor. After trial, the bankruptcy court dismissed all claims with prejudice because the spouse failed to meet her burden of proof. We AFFIRM.

I. FACTS

A. Background Facts

Douglas Huntington ("Doug") and Scott Huntington ("Scott") are brothers. Doug and Scott participated in numerous real estate-related business ventures together, including Horizon Mortgage & Investment Company ("Horizon"),[3] Huntington Properties I, LLC ("HP I"), and Huntington Properties III, LLC ("HP III"). HP I and HP III owned real property in Tacoma, Washington, identified as the Skyline Apartments. Doug and his wife, Laura, and Scott and his wife, Rochelle, jointly owned real property in University Place, Washington, known as the Normandy Park Apartments.

Between 2005 and 2007, Horizon incurred approximately $1.1 million in unpaid payroll tax liabilities. The IRS threatened

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[3] Doug owns 60% of the equity in Horizon; Scott owns 40%.

2

to issue a levy against Horizon and to assess a 100% penalty against Doug personally as responsible party liability pursuant to 26 U.S.C. § 6672.

Doug and Scott attempted to sell the Skyline Apartments and the Normandy Park Apartments (collectively, "Apartments") to generate proceeds to pay Horizon's payroll tax liabilities. When closing dates on pending sales of the Apartments were delayed, Doug requested a loan ("Loan 6640") from Viking Community Bank ("Bank") to pay Horizon's payroll tax liabilities, with proceeds from the sales of the Apartments ("Sale Proceeds") to be used to repay Loan 6640.

Loan 6640 was made to Doug and Laura personally in the amount of $700,000 on November 21, 2007, and it had a maturity date of May 5, 2008. In conjunction with Loan 6640, Doug and Laura signed a promissory note ("Note") and a Business Loan Agreement ("Loan Agreement"). To secure Loan 6640, Doug and Laura granted the Bank a second deed of trust ("Trust Deed") on their residence in Lakewood, Washington ("Residence").

As additional security for Loan 6640, the Bank required an irrevocable assignment ("Assignment") of the Sale Proceeds. The Assignment was signed by Doug, Laura, Scott, Rochelle, HP I and HP III (collectively "Grantors"), and it provided for the application of the Sale Proceeds in the following order: (a) to reduce or pay off Loan 6640, (b) to reduce or pay off Loan 3910 (a consumer loan Doug owed to the Bank), and (c) to reduce or pay off other debts or obligations any of the Grantors owed to the Bank.

3

The Loan Agreement also stated that the assigned Sale Proceeds were to be "first applied to pay off the $700,000 loan to be granted herein."

To place the Bank in second position on the Residence, $99,024.04 of the funds from Loan 6640 ("Loan Funds") were paid to satisfy the existing second position lien creditor, Sound Bank. After paying Sound Bank and the fees associated with Loan 6640, $595,194.90 of Loan Funds remained, and were disbursed in the form of a check made payable to the IRS. That check was issued December 10, 2007, and was given to Doug in an envelope together with a letter from the Bank's Vice President Donn Davy ("Mr. Davy") directed to Revenue Officer Charles Washington. Doug had been in contact with the IRS "many, many, many times" in 2007, and his primary contact had been Mr. Washington. The letter read as follows:

> Enclosed with this letter is a Bank Check payable to the Internal Revenue Service in the amount of $595,194.90 to apply to the tax liability of Horizon Mortgage & Investment Co. for Federal Withholding, Social Security and Medicare taxes. It is our understanding that the Internal Revenue Service has agreed to provide a satisfaction of all tax liens against Horizon Mortgage and Investment with this payment, but that the remainder of monies owing to the Internal Revenue Service by this taxpayer in the amount of $49,972.56 remains unpaid and will be paid upon the closing of the sale of commercial real estate properties now under contract with closing expected to occur within the next 30 days.
>
> <u>If there is any misunderstanding on our part, please contact the undersigned prior to functioning the enclosed check.</u>

Emphasis added.

Doug purportedly hand-delivered the check and the letter to the

4

IRS office in Tacoma, leaving them on the counter rather than personally giving them to any IRS employee.[4] Prior to doing so, he opened the envelope and made a copy of both the check and the letter for his own records.

When the Apartments had not sold within the term of Loan 6640, Doug, Laura and the Bank entered into a Payment Extension Agreement on May 5, 2008. The Payment Extension Agreement recited that the payment extension was requested by Doug and Laura and set a new maturity date of June 5, 2009 for Loan 6640.

On June 20, 2008, approximately six weeks after the Payment Extension Agreement was executed, sales of the Apartments closed. Net Sale Proceeds totaled $649,538.42. The settlement statement for the Skyline Apartments reflects that $200,000 of the proceeds from the sale were held back, $50,000 was paid to "sellers," identified as HP I and HP III, and $132,948.40 was paid to the Bank. The settlement statement for the Normandy Park Apartments reflects that $266,450.02 was paid to the Bank.[5]

Notwithstanding the terms of the Loan Agreement and the Assignment, on June 24, 2013, the Bank applied the Sale Proceeds as follows:

- $136,684.28 to pay off Loan 3902 owed by Scott
- $134,435.23 to pay off Loan 3910 owed by Doug

[4]     The Bank contends that Doug removed the letter from the envelope and delivered only the check to the IRS. The bankruptcy court found otherwise.

[5]     The wire transfer Advice of Credit reflects that the actual amount was $266,590.02.

5

- $ 60,000.00 applied to default charges
- $23,903.59 to pay the June payment on Loan 1625 owed by HP III
- $40,122.24 as a principal payment on Loan 4181 owed by HP III
- $1,709.75 to bring interest current to June 23 on Loan 4181 owed by HP III
- $2,683.33 to bring interest current to June 23 on Loan 6640 owed by Doug and Laura

On June 30, 2008, Doug, Laura, Scott, HP III and the Bank entered into an agreement ("Distribution Agreement") that authorized the foregoing application of the Sale Proceeds, extended the maturity dates for Loan 6640 and Loan 4181, and required the Huntington parties to provide the Bank with additional collateral.

Thereafter, Doug and Laura made the monthly payments required by Loan 6640 almost entirely without dispute.[6] Ultimately, however, they failed to repay Loan 6640 at its extended maturity date, and the Bank commenced foreclosure proceedings on the Residence.

On October 28, 2010, the day before the scheduled foreclosure sale, Doug filed a chapter 11 petition. His case was converted to chapter 7 on June 23, 2011.

The Bank filed a motion for relief from the automatic stay on December 27, 2010. On the deadline for filing a response, Doug and Laura filed an adversary proceeding against the Bank.

B. The Adversary Proceeding

In their amended adversary complaint ("Complaint"), Doug and Laura asserted four claims for relief against the Bank. The first

---

[6] Laura apparently made one payment with a check on which she wrote "Under Protest."

6

claim ("First Claim") sought a determination that the Bank had breached the Assignment when it failed to apply the Sale Proceeds first to Loan 6640. The second claim ("Second Claim") sought a declaration of the balance due on Loan 6640 with the Sale Proceeds deemed to have been applied to Loan 6640. The third claim ("Third Claim") sought a determination that the Bank had breached the Loan Agreement by failing to obtain from the IRS a full satisfaction of Horizon's payroll tax obligations outstanding at the time the Loan Funds were paid to the IRS. The fourth claim ("Fourth Claim") sought equitable subordination of the Bank's secured position in the Residence to the IRS lien filed subsequently, because the IRS lien arose as a consequence of the Bank's breach of the Loan Agreement, as set forth in the Third Claim.

The bankruptcy court entered its Scheduling Order and Notice of Trial on June 8, 2011, setting trial of the issues for December 7, 2011.

The First Claim was the subject of partial summary judgment proceedings ("Summary Judgment Motion"). The Bank asserted that the application of the Sale Proceeds did not breach the Assignment, because all parties to the Assignment had executed the Distribution Agreement, thereby ratifying the actual distributions. Doug and Laura opposed the Summary Judgment Motion on the basis that the Distribution Agreement was unenforceable because it was not supported by consideration. They pointed to the fact that the Payment Extension Agreement already had extended the maturity date for Loan 6640 from May 8, 2008, to June 5, 2009, and they asserted

7

that the Distribution Agreement gave nothing more, at least as to Laura, who owed no other obligations to the Bank. They further asserted that the Assignment was explicitly denominated "irrevocable," such that the Distribution Agreement was inoperative to alter the distribution terms set forth in the Assignment. Finally, they asserted that they had signed the Distribution Agreement under duress.

Following argument on the Summary Judgment Motion on September 14, 2011, the bankruptcy court ruled that no issue of fact existed and that the Distribution Agreement was supported by consideration as a matter of law. The bankruptcy court reasoned that the consideration did not need to flow to Laura for it to be valid and enforceable; the consideration could go to a third party. Under the Distribution Agreement, Doug, Scott, and HP III all received benefits, either by payment of an outstanding obligation, by cure of an existing default, or by the extension of a maturity date, and because $50,000 in funds were released to "Huntington, whatever that exactly is." The bankruptcy court also determined that Laura received an indirect benefit without articulating what that might have been. The order granting the Summary Judgment Motion on the issue of legal consideration was entered September 23, 2011.

On November 14, 2011, having participated fully in pretrial proceedings, including proceedings on the Summary Judgment Motion, Laura moved for dismissal ("Dismissal Motion") of the adversary proceeding, without prejudice, asserting that in its then recent

8

decision in <u>Stern v. Marshall</u>, ___ U.S. ___, 131 S.Ct. 2594 (2011), the Supreme Court had made clear that the bankruptcy court lacked subject matter jurisdiction to hear the claims for relief pled in the Complaint. The bankruptcy court heard the Dismissal Motion on December 7, 2011. During colloquy with counsel, the bankruptcy court explained why <u>Stern</u> did not deprive it of subject matter jurisdiction over the claims for relief alleged in the Complaint. The bankruptcy court observed that Doug and Laura could have filed the Complaint in state court, but chose instead to file it in the bankruptcy court. The Complaint itself

> . . . asserted not only that the Court had jurisdiction, but that this was a core matter under 28 U.S.C. § 157. They proceeded in this case through discovery and a summary judgment motion, and on the eve of trial, filed this motion.

> Assuming this Court has subject matter jurisdiction, the Court concludes that the plaintiffs demonstrated the necessary affirmative consent to the Court rendering a final judgment in this case.

Tr. of Dec. 7, 2011 H'ring at 22:21-23:4.

The bankruptcy court ruled that core subject matter jurisdiction existed pursuant to § 157(b)(2)(K) where the Fourth Claim sought a determination of the validity, extent and priority of the lien of the Bank in and to an estate asset: the Residence. Although the Second Claim for declaratory relief and the First and Third Claims for damages based upon the Bank's alleged breach of contract were not core matters, the bankruptcy court had "related to" jurisdiction. Doug and Laura had explicitly consented to the bankruptcy court entering final judgment on those claims.

The bankruptcy court denied the Dismissal Motion and reset the trial to December 29, 2011.

Doug and Laura were the only witnesses at trial. In their testimony, they argued that the Bank should be held accountable for the IRS lien that had been filed against the Residence. In their view, the Loan Agreement required the Bank to negotiate with the IRS and to achieve a reduction in the $1.1 million payroll tax liability such that the Loan Proceeds would have been sufficient to satisfy all obligations in connection with Horizon's payroll tax liabilities.

In support of their theory, Doug strenuously maintained that the Bank intended Loan 6640 to relieve Horizon of the threat of IRS action to allow Horizon to continue operations and thereby to generate funds to facilitate Doug, Scott, and their various entities' repayment of outstanding loans to the Bank in the approximate aggregate amount of $4 million. As evidence, Doug and Laura presented a September 21, 2007 email communication in which Mr. Davy proposed a loan to Doug in the amount of $1.5 million, stating,

> You may notice that not only the amount of the loan is more, but the purposes are a bit different as well. The bank is firm that the IRS will be paid in full, as that is the only way we can take the pressure off you and assure that Horizon will not have problems going forward. There will also be loan covenants regarding future IRS payments being kept current.

Doug contends this language is proof of the Bank's knowledge that the payroll tax liabilities were greater than the amount funded through Loan 6640. However, a more accurate reading of this

10

communication reveals that the proposal was to finance $625,000 to pay off Horizon's payroll tax liabilities owed to the IRS and to refinance several outstanding obligations of Doug, Scott, and various entities affiliated with them.

Doug also pointed to language in the Loan Agreement which in his opinion demonstrated that the Bank had reached, or was obligated to reach, a settlement with the IRS and was to obtain complete releases of liability on behalf of Horizon and therefore on behalf of Doug. That language states:

> 1. Borrower agrees with Lender that loan proceeds will be utilized as follows:
> . . .
> (b) Pay off the IRS levy against Horizon Mortgage in the anticipated amount of $625,000 or less. A Lender Cashier's Check will be issued to make this payment and we will [sic] provided a copy of the Settlement Agreement with IRS indicating that the lien is paid in full.

In Doug's view, this language was meant to read that the Bank "will provide" a copy of the Settlement Agreement; however, another view is that the intended language was that the Bank "will be provided" a copy of the Settlement Agreement. In light of the placement of the foregoing language under the heading "Affirmative Covenants," which thereafter recited various covenants of the borrower, the latter reading is more likely.

At trial, despite the repeated questions on the subject, Doug was unable to explain why he believed the IRS would accept $625,000 in satisfaction of the tax debt or even to explain the source of the $625,000 figure. The actual amount of the tax liability was $1.1 million. During the relevant period, Doug was in constant contact

11

with IRS revenue officer Charles Washington. However, there is no evidence that Doug ever communicated the true amount of the IRS liability to the Bank. To the contrary, the aforementioned communication from Mr. Davy stated, "I am proceeding on the assumption that the IRS issue will require $625,000, including interest and penalties, which hopefully will be more than ample – better to have too much rather than too little available . . . ." Imbedded in his response to that email, Doug replied, "The 625k is correct."

Laura and Doug asserted that the Bank's failure to obtain a settlement with the IRS on behalf of Horizon harmed them, such that it was equitable to subordinate the Bank's lien position to that of the IRS. They asserted further that the failure of the Bank to obtain a settlement with the IRS injured them by leaving Doug subject to personal liability in the approximate amount of $400,000, for which they were entitled to judgment. Neither Doug nor Laura could explain how they believed the Bank could negotiate with the IRS on behalf of Doug and/or Horizon where there was no evidence that the Bank could present the IRS with any authorization to do so. To the contrary, Doug acknowledged on cross-examination that he had not provided the Bank with a power of attorney or any letter of authorization that would have empowered the Bank to negotiate a settlement of Horizon's payroll tax liability with the IRS.

With respect to their challenge to the validity of the Distribution Agreement, Doug and Laura testified that they believed that the Bank had misrepresented to them that Loan 6640 was in

default. They did not sign the Distribution Agreement until the Bank threatened to foreclose on the Residence. When forced to acknowledge that the Note contained a cross-default provision, Doug and Laura shifted their characterization of the Bank's "threats" to foreclose from misrepresentations to an improper use of duress in obtaining their signatures on the Distribution Agreement.

After trial, the bankruptcy court took the matter under submission. Its oral ruling was read into the record on January 12, 2012. The bankruptcy court concluded that all of Doug and Laura's arguments were "without merit and that their claims against [the Bank] should be dismissed. . . ."[7] The bankruptcy court expressly found that the Bank was under no duty to negotiate with the IRS on behalf of Horizon or Doug; that Doug and Laura had not satisfied their burden to prove that the Bank had breached any contract with them; that the Distribution Agreement was supported by consideration and in signing it, Doug and Laura had ratified the changed distribution of the Sale Proceeds; that Doug and Laura had not proven that the Distribution Agreement was signed under duress so as to render it void, or that the Bank had misrepresented to Doug and Laura that Loan 6640 was in default based on the existence of the

---

[7] The phrase "without prejudice" is appended to this sentence. However, having had the opportunity to present their claims at trial, the dismissal should have been "with prejudice." In fact, the judgment actually entered reflects dismissal "with prejudice."

13

cross-default provision.[8]

The bankruptcy court entered its judgment of dismissal on January 30, 2012. Laura timely filed her notice of appeal of the judgment on February 13, 2013.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (K). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

Whether the bankruptcy court had "related to" jurisdiction over the First, Second and Third Claims asserted in the Complaint.

Whether the bankruptcy court erred when it concluded that the Distribution Agreement was supported by consideration.

Whether the bankruptcy court erred when it determined that Laura had failed to meet her burden of proof as to all claims asserted in the Complaint.

## IV. STANDARDS OF REVIEW

Jurisdictional issues in bankruptcy are reviewed de novo. See In re McGhan, 288 F.3d 1172, 1178 (9th Cir. 2002). De novo review requires that we consider a matter afresh, as if no decision had been rendered previously. United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988); B-Real, LLC v. Chaussee (In re Chaussee),

---

[8] The bankruptcy court also found that the Bank "was entitled to declare Loan 6640 in default because Doug breached the terms of Loan 6640 by failing to keep the Horizon payroll tax current . . . ." Judgment, at 15:23-25.

14

399 B.R. 225, 229 (9th Cir. BAP 2008).

We review determinations of questions of fact for clear error. Rule 8013; Wall St. Plaza, LLC v. JSJF Corp. (In re JSJF Corp.), 344 B.R. 94, 99 (9th Cir. BAP 2006). We must affirm the bankruptcy court's fact findings unless we conclude that they are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" United States v. Hinkson, 585 F.3d 1247, 1262 & n.20 (9th Cir. 2009) (en banc). "Under the 'clear error' standard, we accept findings of fact unless the findings leave 'the definite and firm conviction that a mistake has been committed by the trial judge.'" Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 230, aff'd in part & dismissed in part, 551 F.3d 1092 (9th Cir. 2008), citing Latman v. Burdette, 366 F.3d 774, 781 (9th Cir. 2004). We review de novo the bankruptcy court's conclusions of law and its interpretation of statutes and rules. Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 32 (9th Cir. BAP 2008).

## V.  DISCUSSION

### A.  The Bankruptcy Court Did Not Err in Exercising Jurisdiction

In her opening brief, Laura concedes that the bankruptcy court had core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(K) to hear and determine the Fourth Claim, which sought a subordination of the Bank's lien on the Residence to the IRS lien. Laura also concedes that she consented to the bankruptcy court's jurisdiction when she filed the Complaint. Laura then asserts that the only issue regarding jurisdiction on appeal is whether the bankruptcy court had

15

"related to" jurisdiction on the remaining claims for relief.

Laura did not challenge the bankruptcy court's jurisdiction until after it had heard and decided in summary judgment proceedings a central issue concerning her state law claims against the Bank, i.e., that the Distribution Agreement was supported by consideration. We view the Dismissal Motion as nothing more than thinly disguised forum shopping. Laura invoked the bankruptcy court's jurisdiction in the first instance; she cannot now complain that the bankruptcy court exercised that jurisdiction.

B.   The Disbursement Agreement Was Supported By Consideration

Consideration is broadly defined under Washington law to be "any act, forbearance, creation, modification or destruction of a legal relationship, or return promise given in exchange." Labriola v. Pollard Group, Inc., 100 P.3d 791, 793 (Wash. 2004)(citation omitted).

1.   The cross-default provision of the Note

Laura, in effect, assented to the use of the Residence to help Doug extricate himself from his impending personal tax liabilities which arose as a consequence of his failure to ensure that Horizon's payroll tax obligations were met. In her testimony, she echoed statements by Doug that the Bank wanted to ensure Horizon's IRS obligations were resolved so that Horizon and other Huntington-related entities could operate to generate funds to pay outstanding loans owed to the Bank of approximately $4 million. Understanding that Loan 6640 was part of an effort to facilitate the health and survival of Doug's ongoing business interests, she signed the Note.

16

The Note included a cross-default provision. Despite the presence of the cross-default provision in the Note, Laura steadfastly ignores both its existence and its implications in the context of the Distribution Agreement.

Because Loan 4181, an obligation of HP III, was in default, the Bank had the right to declare Loan 6640 in default based on the cross-default provision in the Note. By signing the Distribution Agreement, Laura obtained a direct benefit: the default under Loan 4181 which would have allowed the Bank to declare Loan 6640 in default was cured, and Laura thereby preserved her ability to maintain the extension of the term of Loan 6640 previously agreed to. Had Laura not signed the Distribution Agreement, the Bank could have declared Loan 6640 in default as early as June 2008.

2. The "irrevocable" Assignment

Laura accedes that parties to a contract can reform that contract and that mutual releases of prior rights and obligations can be sufficient consideration for the reformed contract. To get around this general principle of contract law and the effect of the cross-default provision in the Note, Laura stretches credulity by asserting that the Distribution Agreement could not, as a matter of law, change the terms of distribution set forth in the Assignment, because the Assignment was "irrevocable." She asserts that under Washington law, "irrevocable means irrevocable" when it comes to assignments. The cases upon which Laura relies to support this bright line rule are distinguishable from the facts at issue before this Panel. Both Pacific Coast v. Anderson, 107 F. 971 (9th Cir.

17

1901), and <u>Timeline, Inc. v. Proclarity Corp.</u>, 2007 WL 1574069 (W.D. Wa. 2007), relate to attempts by <u>one party</u> to revoke an irrevocable assignment. The Distribution Agreement does not in any way represent a <u>unilateral</u> effort to revoke the "irrevocable" Assignment. The Distribution Agreement was signed by each and every Grantor of the Assignment. As such, each Grantor, including Laura, effectively waived the right to assert that the Assignment could not be revoked.

C.    <u>The Bankruptcy Court Properly Entered a Judgment of Dismissal</u>

Laura did not establish any obligation either was undertaken by the Bank or imposed upon the Bank through the Loan Agreement to negotiate a settlement with the IRS on behalf of Horizon. Doug's uncontradicted testimony confirmed that he never provided the Bank with authorization to negotiate a resolution of claims directly with the IRS. This alleged obligation was the essential underpinning of the relief sought by the Huntingtons under the Third and Fourth Claims in the Complaint.

Because the Distribution Agreement, which was supported by adequate consideration, legally altered the distribution of the Sale Proceeds, Laura cannot establish a claim against the Bank based upon its distribution of the Sale Proceeds in accordance with the Distribution Agreement. As such, Laura could not prevail on the First and Second Claims of the Complaint.

The record confirms beyond question that Laura did not meet her burden of proof on any of her claims for relief against the Bank. The bankruptcy court did not err when it entered the judgment

18

dismissing all claims with prejudice.

## VI. CONCLUSION

The sum and substance of this appeal is nothing more than Laura's effort to avoid the effects of her own choices. She invoked the jurisdiction of the bankruptcy court to determine her disputes against the Bank. When the foundation of her claims, i.e., that the Distribution Agreement was not supported by consideration, was decided against her, she sought to escape the jurisdiction of the bankruptcy court by asserting that it lacked (1) the jurisdiction she had invoked, and (2) the power, to which she had consented, to enter judgment on matters within the bankruptcy court's "related to" jurisdiction. Having been unsuccessful in her efforts to extricate herself from an unfavorable finding and the continuing jurisdiction of the bankruptcy court, Laura then asserted, in effect, that the bankruptcy court should have protected her from her own action in "revoking" the Assignment, because her revocation was invalid as a matter of law.

There is no evidence in the record that the Bank undertook an obligation, contractual or otherwise, to solve Doug and Horizon's payroll tax problems with the IRS. The Bank simply loaned money in the expectation, based on Doug's representation(s), that the Loan Funds would satisfy the IRS debt.

We AFFIRM.